## WM. A. SIMPSON v. C. S. GREELEY, et al.

1. AMENDMENT; *Interlineation.* The supreme court will not reverse a case because the plaintiff was suffered to amend his petition by interlineation, where it is apparent the defendant was not injured thereby.

2. ESTOPPEL; *Effect of Recital.* S., as president of a railroad company, made a deed for the company to certain lands. At the same time C. gave an instrument in writing to the purchaser, in which it was recited that the railroad company had made such a deed: *held,* that this recital estopped C., and those holding under him with a knowledge of the facts, from denying that S. was authorized by the company to make the deed.

3. ―――― *Effect of Quit-claim.* A deed made in February, 1867, using as terms of conveyance the words " convey, remise, release, and forever quit-claim," *does not operate as an estoppel to prevent the grantor or* his vendors from setting up an after-acquired title to the same lands.

4. TITLE TO LANDS; *Consideration; Void Deed.* In February, 1867, the Missouri River Railroad Co. had no such interest in the lands known as the Delaware Diminished Reserve, as that they could convey the same by deed. And such a deed made at that time, without consideration, and induced by vicious causes, cannot be set up as an equitable defense to a suit for the recovery of the lands, as such a deed has no equity, and will not be enforced.

5. PRACTICE; *Misjoinder; Waiver.* If there is a misjoinder of causes of action, and the misjoinder is apparent on the face of the petition and is not taken advantage of by demurrer, the defect is waived.

6. FINDINGS; *Construction.* Where one of the findings of fact by the court is capable of bearing two constructions, that one will be given it that brings it within the issues in the case.

*Error from Leavenworth District Court.*

EJECTMENT, brought by *C. S. Greeley* and seven others, against *Wm. A. Simpson* and eight others, to recover the possession of 644 acres of land. The petition alleged that plaintiffs were owners of said lands in fee, and contained a demand also for the recovery of the rents, issues and profits of said lands for twenty-two months, and damages for cutting down and carrying away timber. The petition was filed December 9th 1868. Defendants answered, admitting their possession of said lands since February 21st 1867, and alleging, 1st, that the lands claimed were a portion of the Delaware Diminished Reserve lands mentioned in the treaty of July 4th 1866 made between the Delaware Indians and the United States; 2d, that in August 1866 the Secretary of the Interior gave notice to the Mo. River Railroad Co. that he was authorized to contract with them or any responsible party for the sale of the lands mentioned in art. 7 of said treaty, and said railroad company elected to purchase said lands under said treaty, etc.; 3d, that on the 31st of August 1866 the Secretary of the Interior, James Harlan, and said Mo. River Railroad Co., by L. T. Smith, its president, entered into a written agreement in and by which the United States was to sell and said company were to purchase "all said lands provided to be sold by said treaty at and for the sum of $2.50 per acre, exclusive of improvements," etc., (value of improvements to be ascertained and paid for in addition,) to be paid for "from time to time" "as often as the Secretary of the Interior shall notify the said party of the second part that 10,000 acres or more of said lands have been vacated by the Indians," etc.; 4th, that under said agreement said Railroad Co. paid for said lands, and on the 21st of February 1867 said company, by said Smith its president, sold and conveyed the 644 acres thereof in controversy to Samuel N. Simpson—(said conveyance is set forth in full, and is in form an ordinary quit-claim deed, purporting to be made "in consideration of one dollar and other valuable considerations;") 5th, that on said 21st of February said company, by

Smith its president, and Alex. Caldwell its vice-president, of the one part, and said Simpson of the second part, entered into a written agreement concerning said lands, which agreement *recited* the making of the deed of that date by said Smith as president to said Simpson, and provided among other things that if said company should not obtain title to the said 644 acres under said treaty said deed to Simpson should be void, and in such case if said company should obtain title to other lands under said treaty said Simpson might select from such other lands an amount equal to the number of acres mentioned in said deed, etc.; 6th, that a certain agreement was made May 10th 1867 by and between W. A. Simpson, S. N. Simpson, H. M. Simpson, Union Pacific Rly. Co., E. D., R. M. Shoemaker & Co., Shoemaker, Miller & Co., and John D. Perry, concerning and in settlement of certain matters between them, (but it does not appear from said instrument that it in anywise related to the lands in question;) 7th, that on the 28th of May 1867 said S. N. Simpson and his wife conveyed by deed of general warranty said 644 acres of land to *Wm. A. Simpson*, one of the defendants, under which deed said defendant went into possession of said lands in good faith, and has made valuable improvements thereon; 8th, that " on the 28th of October 1867 said plaintiffs, and said Alex. Caldwell, and others, fraudulently combined and confederated together to cheat and defraud said *Wm. A. Simpson* and said S. N. Simpson out of said lands," and to this end " induced and procured the United States, its officers and agents, to make and deliver to and in favor of said Caldwell, as pretended assignee of said Mo. River Railroad Co.," certain patents to the lands in controversy, and that in furtherance of said fraudulent purpose said Caldwell, on the 28th of March 1868 conveyed said lands to the plaintiffs; 9th, that the other defendants (eight of them) are tenants of defendant *Wm. A. Simpson*, and have no other interest in the premises. To this answer plaintiffs replied, 1st, that said L. T. Smith was not the agent of said Mo. River Railroad Co., and had no authority to make said deed of February 21st 1867 to said S. N. Simpson; 2d, that neither Smith nor Cald-

well had authority to make said agreement of February 21st; 3d, that the instrument of May 10th 1867 had no connection with the subject-matter of this action; 4th, that there was no consideration for said deed of February 21st, and that defendant *Wm. A. Simpson* well knew this fact when taking his deed from said S. N. Simpson, that said Simpsons were brothers, and that the deed from said S. N. S. to said W. A. S. was without consideration; 5th, that plaintiffs' purchase of said lands from Caldwell was *bona fide*, and that they paid Caldwell therefor the full consideration of $20 per acre. (The record in this case is very voluminous. It sets forth in full all the pleadings, contracts, agreements, deeds, etc., and all the testimony offered and rejected, all the testimony admitted, and the conclusions of fact, and law, and judgment of the court—and if here inserted would fill at least 250 pages of this book.) The case was tried at the May Term, 1870. The court found in favor of the plaintiffs, and gave judgment in their favor for the recovery of the possession of the lands in controversy, and against defendant *W. A. Simpson* for $4,300, the value of the rents, issues, and profits, and the value of the timber taken by said *Simpson* from said premises. *Simpson* excepted, and moved for a new trial. On the hearing of said motion one of the errors complained of was the order of the court giving plaintiffs leave, before trial, to amend their petition by interlining therein the words in *italics* in the following quotations from said petition: "Said plaintiffs have a real *and legal* estate in," etc., "lying in the county of Leavenworth, *and are entitled to the possession thereof*, and that said defendants," etc. New trial refused, and defendant *Simpson* brings the case here on error for review.

*Clough & Wheat*, for plaintiff in error:

1. Wm. A. Simpson and his tenants were in possession of the lands in controversy continuously ever since the 21st of February 1867, so that the plaintiffs purchased from Caldwell with full notice of all the rights and title of said Simpson: 4 Wallace, 232; 1 Black, 352; 21 How., 493; 15 Ill., 542; 23

Iowa, 381; 1 Denio, 257. And by the conclusions of fact found it appears that said plaintiffs took their conveyance with actual notice of the rights of Simpson, and there is nothing which tends to show that plaintiffs were *bona fide* purchasers without notice of Simpson's rights: 18 Ill., 346; 10 Peters, 211.

2. Caldwell in and by the agreement admits the railway company made the deed of 21st February, and neither he nor those claiming under him can be heard to say or claim anything to the contrary of what he thus said: 1 Greenl. Ev., §§ 23, 207; 5 Ohio, 199; 21 Me., 130; 1 Oregon, 327; 35 Ill., 359; 4 Cranch, 81; 23 How., 228; 19 Johns., 7; 14 Cal., 629. And in relation to this matter of estoppel, and the fraud Caldwell would perpetrate if he or any one claiming under him could now, after having so made such statement be heard to say that Smith had not power to execute the deed, or that it was not the deed of the railroad company, see 14 Wis., 281; 18 Conn., 443.

3. We suppose that be the contract of purchase of the then Delaware Reservation made by the railroad company, on the 31st of August 1866, from the Secretary of the Interior in pursuance of said treaty, the railroad company became the owner thereof, including the lands in controversy. But even if the interest of the railroad company had only been a mere contingency, it would have been transferable: Lewin on Trusts, 490, (600;) 3 Lead. Cas. in Eq., 306; 2 Wash. on Real Prop., 20, § 27; p. 578, §§ 9, 10; 6 N. Y., 179; 3 Gray, 147; 6 R. I., 445. And because of said contract and deed of 21st February 1867, and his connection therewith, it was fraudulent in Caldwell to take the patent to himself as against S. N. Simpson and his grantee, W. A. Simpson, and that he took the title as trustee for said W. A. Simpson: 49 Penn. St., 457; 5 Gilman, 573; 10 Johns., 457; 44 Mo., 444.

4. That ejectment can be maintained on an estoppel, see 2 Smith's L. C., 644; 1 Oregon, 327; 11 How., 322; 4 Peters, 80. And this list of cases, as we understand them, establishes the proposition that quit-claim deeds estop a party from claim-

ing against anything intended to be thereby conveyed; and of course it is evident therefrom, that it was the intention of the parties to said contract and deed of the 21st February 1867 that S. N. Simpson was to have the *lands* in controversy.

If it shall be urged that the lands in controversy were not patented to the railroad company, and that therefore the title of plaintiff in error has failed, then in answer thereto we claim that Caldwell, or any one claiming under him, is not in position to make such objection: 3 Wash. C. C., 529; 9 Bosw., 261; 8 Wallace, 77; 9 Minn., 223; 19 Barb., 266.

5. That any supposed defect in the consideration of the contract and deed of 21st February 1867 does not affect the plaintiff in error, see 10 Wendell, 184. And even if the said deed had been or was made for an illegal consideration, we submit that it was an executed contract, the court will not relieve against it: 32 Me., 35; 44 id., 25; 3 Foster, 128; 11 Mass., 368; 5 Geo., 404. And further, we submit that as a consideration is recited in said deed, it is not, and was not competent for the railroad company or any one claiming under it (as said plaintiffs' are,) to pretend that said deed was or is without consideration, for the purpose of impairing its effect as a conveyance: 35 Ala., 636; 16 Wend., 460; 36 N. H., 86; 29 Me., 410; 31 Barb., 371; 3 Wash. on Real Prop., ch. 5, § 4.

*Stillings & Fenlon,* and *R. Crozier,* for defendants in error:

1. The patent conveyed the legal title to Caldwell on the 15th of October 1867, and his deed on the 26th of December 1867 conveyed that legal title to the defendants in error: 1 Ohio State, 390; 6 Peters, 320; 6 id., 328; 10 id., 135; 13 id., 436. And plaintiff in error is not entitled to any relief on the claim of right and title set up and asserted by him. At the time of the purchase claimed by Simpson the land was not such a subject of contract that the parties could have made a binding sale of it. An uncertain undeterminate right remained in the Indians in all of the lands: 4 Kas., 1. And such a contingent interest is not the subject of grant or sale: 13 Wend., 177; 5 Denio, 665; 12 Pick., 47; 38 N. H., 48; 9 La.,

298; 11 S. & R., 389; 11 Ohio, 475; 9 Wheaton, 452; 3 Leigh, 365; 2 Conn., 256; 3 Shepley, 351; 14 Ill., 304; 2 Smith's L. C., 735.

Suppose, however, that it would have been competent for the railroad company to have sold the land, and thereby invested Simpson with an equitable title to it, we then maintain that the act of Smith and Caldwell did not amount to a sale. The railroad company had not authorized them to make the sale: § 15, ch. 44, Laws of 1865, under which the company acted; Ang. & A. on Corp., 224. The contract for the sale of the land was extorted by Simpson by his illegal interference with the Indians, and by his promise to do that which he was bound to do, and is therefore without any consideration. A claim tainted with fraud, corruption, oppression or illegallity will not be enforced by a court of equity: 2 Story Eq., § 769; Sug. on Vend., 125 to 135, 224, 231.

The two papers of February 21st are but one contract, and are an executory contract. A contract made as this was, without authority in Smith or Caldwell to make it, will not be enforced in equity: 2 Lead. Cases in Eq., 669.

2. It is urged that Smith and Caldwell are estopped to deny this sale to plaintiffs in error. This might have some force if the contract made by them with S. N. Simpson had been otherwise unexceptionable, and Smith and Caldwell had at the time had an interest in the property which they failed to make known. But their interest did not accrue till October 1867. But the law of estoppel could not then cure any defects known to the parties, or transfer to Simpson any greater title than he had a right to suppose he was getting: 16 Wis., 181; 1 R. I., 289; 21 Ind., 110. And a grant of one's right and title to land does not estop him from showing that he had at the time no title, and asserting an after-acquired title: 2 Smith's L. Cas., 709; 14 Pick., 469; 3 Watts, 95; 2 Caines, 195; 11 Wend., 110; 22 Cal., 468.

3. It is claimed that the court erred in allowing the amendment to the petition. The amendment was immaterial, as the petition was good without it: 27 U. S. D., p. 213, § 61; 38 Ill.,

226. But if it had not been immaterial the defendants answered the amended petition, and went to trial on the issue thus made.

The opinion of the court was delivered by

KINGMAN, C. J.: The practice of amending pleadings by interlineation is very reprehensible; but where the party has answered after such an amendment he cannot be heard on that point when asking a reversal. It is the duty of each court to preserve its records, and prevent their mutilation; but it would be a burlesque on the administration of justice if after a protracted trial of an important case the judgment should be reversed for a cause that in nowise affected the rights or interests of the party complaining.

This action was instituted to recover the possession of certain lands forming part of what was once the Delaware Diminished Reserve, and also for rents of said lands and for timber taken off the same. The case was tried by the court which made numerous findings of fact, and gave judgment for the plaintiffs. From that judgment the defendants appeal to this court. Plaintiffs and defendant Simpson claimed to derive title from and by virtue of the provisions of the treaty with the Delaware Indians made July 4th, 1866, and ratified on the 26th of said month. The plaintiffs' title was a patent from the United States to the land dated October 26 1867 to A. Caldwell the assignee of the Missouri River Railroad Company, and a deed from Caldwell and wife to plaintiffs dated December 26, 1867. Thus the plaintiffs showed a perfect paper title in themselves, and which alone would entitle them to recover. The defendant (plaintiff in error) as a defense presented in evidence certain facts and papers which it is claimed were of themselves sufficient to establish his right to the land and prevent a recovery. The defendant read in evidence a deed from the Missouri River Railroad Company by L. T. Smith, president, to Samuel N. Simpson, dated Feb'y 21, 1867, to the land in controversy, which deed used the following terms of conveyance: " do hereby convey, remise, release, and forever quit-claim to the said

Samuel N. Simpson, his heirs and assigns forever, all the right, title and interest acquired by the Missouri River Railroad Company under treaty of July 4th, 1866, or that they may hereafter acquire under or by virtue of said treaty." The deed also contained this stipulation: " It being understood that if there are any improvements on the above described lands to be paid for under the treaty before mentioned the said Simpson shall pay for the same; and reference is also hereby made to an agreement of the parties of this date, which qualifiedly controls this deed." This agreement which is in evidence is made by Smith, president, and Caldwell, vice-president of the road, and Samuel N. Simpson, and recites the making of the deed for the land in controversy, and covenants among other things that the company will use the same diligence to obtain a patent for this land that they do to obtain a patent for other lands purchased by said company " under the contract of purchase of said Delaware Diminished Reserve pursuant to the terms of the treaty of July 4, 1866;" and if the company do not acquire a title to said lands Simpson shall be allowed to select other of said lands equal in amount, and the company will convey the same to the said Simpson; and Leonard T. Smith president and Alexander Caldwell vice-president of said company covenant that " this agreement shall be well and truly kept by said railroad company." These papers were recorded on the 31st of March, 1868. The land was conveyed by deed of S. N. Simpson and wife to the plaintiff in error on the 28th of May 1867. The court found as a fact that the plaintiffs when they took the conveyance from Caldwell to themselves knew that defendant Simpson was in possession of the land, claiming under the title above mentioned. The court also found that S. N. Simpson had obtained such an influence over the Indians that he was enabled to prevent them from registering as contemplated by the provisions of the treaty of July 4, 1866, and that he actually did prevent them from registering, and that he did so for the purpose of compelling the railroad company to give him a section of said lands without consideration, and the deed and agreement above mentioned were the result of Simpson's efforts

to obstruct the carrying out the provisions of the treaty, and no other consideration passed therefor; and the testimony fully sustains the findings of the court on this particular. The court further finds that the said Smith and Caldwell had never been authorized by the said railroad company or by its board of directors to sell or dispose of said lands, or to make the instruments bearing date February 21st 1867, nor had either of them been so authorized, nor did the company at any time afterwards ratify or confirm said attempted disposition of the lands in controversy. The court found that the deed from S. N. Simpson and wife to plaintiff in error was without consideration, and was taken by plaintiff in error by collusion with his brother S. N. Simpson, and to complicate the title to the said lands; that when he took the deed plaintiff in error had seen both of said instruments dated February 21st 1867, and had notice of the facts and circumstances which induced the making of the same. It is further found that William A. Simpson tendered Smith for the railroad company for the improvements on the premises that Simpson was to pay for the sum of fourteen hundred dollars, in the fall of 1867, which they refused to accept.

So much of the findings of fact as made by the court are presented, that the views of this court may be more readily understood. The findings are very voluminous, and so far supported by the evidence that according to well-established principles we cannot in this court say that they are wrong. The evidence does not show the parties concerned in the original transaction out of which this suit has grown in the most favorable light. If one party attempted to obtain a title to valuable property by obstructing the legitimate action of others, the other party removes that obstruction by stipulations which they hasten to make valueless as far as in their power. These remarks are made in response to the comments of the eminent counsel on either side, who not only claimed the land by virtue of legal rights, but by appeals to "conscience and a sense of justice." This court happily has no power to enforce its own ideas of right and justice, in this or any other case. Such power would

Simpson v. Greeley.

make a court a despotism, settling questions not by any fixed standard, or settled rules, but by an arbitrary decision according to the ever-varying notions of justice. The court can only declare the law, and leave it to operate upon the facts of the case.

The law holds the deed of the 21st of February 1867 purporting to convey the land in controversy to Simpson by the Missouri River Railroad Company to be inoperative as a conveyance, because the parties pretending to act for the company had no authority to make such a conveyance, and their acts in the premises were never ratified by the company; and therefore the deed, as a conveyance, did not bind the railroad company. The deed of 21st of February, executed by Smith, purported to be done by the railroad company by him as president. By the contract of the same date, Caldwell, over his signature, recited that the railroad company had made such a deed. There is nothing appearing in the testimony showing that Simpson had any knowledge that Smith was acting without full authority from the company. It is claimed that because of Caldwell having so made such statement in the contract, that neither he nor those claiming under him can now be heard to say that Smith had no authority from the company to make the deed. The defendants in error took their title with a full knowledge of Simpson's claim, and of the grounds on which it rested; therefore they are in no better condition than Caldwell himself would be, had the title remained in him. Would Caldwell have been estopped from denying that Smith had authority from the railroad company to make the deed to Simpson, which he made on the 21st of February 1867? If good faith would not permit Caldwell to deny what he had solemnly asserted under his hand, and on the faith of which Simpson had acted, then the fact that Smith had no authority from the company to make the deed is of no importance, for it is a fact that neither Caldwell nor those holding under him can be allowed to prove. It is merely saying that a man shall not show the truth as to a certain fact, as to do so would be a

fraud upon some party who has relied upon his previous acts in his affairs.

We then proceed in the examination as though the deed from the railroad company was made upon sufficient authority from the company to Smith. To clear the case from obscurity we may assume that the title of the plaintiffs was also under the railroad company, though this is a point not free from great doubt; but it places the plaintiff in error in the most favorable attitude, and his claim in a position more advantageous than is perhaps strictly its due. While Caldwell and those holding under him are estopped from denying that Smith had authority to make the conveyance that he did, it is not an estoppel that created an estate, or runs with land. It grows out of the recitals in the bond signed by Caldwell, and because it was the act of Caldwell, and not out of the deed of Smith as president of the road. The deed itself is not of a character that works an estoppel against a subsequently-acquired title by the grantors. The deed itself is at most a quit-claim deed. The terms used are "convey, remise, release, and forever quit-claim." Such a conveyance does not prevent the grantor from acquiring subsequently a perfect title to the land, and will not estop him from asserting such subsequently-acquired title against the grantee. *Bell v. Twilight*, 6 Foster, 401; *McCracken v. Wright*, 14 Johns., 193; *Woodman v. Hubble*, 9 Cowen, 613; *Comstock v. Smith*, 13 Pickering, 116; *Miller v. Ewing*, 6 Cushing, 34. The true principle is thus stated: "The general doctrine prevailing in the United States is that no estate can be passed by the ordinary terms of a deed unaccompanied with covenants of warranty which is not vested in interest at the time; and that estates subsequently acquired, whether by purchase or descent, are unaffected by such previous conveyance in the hands of the grantor, or those claiming under him. This general doctrine is, however, subject to this qualification: that where it distinctly appears from the face of the instrument without the covenant of warranty, either by recital or otherwise, that the intent of the parties was to convey and receive, reciprocally, a certain estate, the grantor will be estopped from denying the

operation of the deed according to such intent." *Clark v. Baker*, 14 Cal., 612; *Van Renssalear v. Kearney*, 11 Howard, 297. The deed from the railroad company to Simpson was simply a quit-claim deed, passing only the interest which the company then had in the land, and therefore it does not purport to convey a greater estate than the company then had, and is not affected by the provisions of § 4, ch. 41, Comp. Laws, p. 354, which was in force when the deed was made. Technically, then, this deed created no estoppel.

The question then arises, what effect had the conveyance at the time it was made? In other words, had the railroad company such an interest in the land as that they could make a binding and legal contract in relation to it? The company certainly had not any legal title to the land. Neither had it any possessory right whatever. There was nothing like the right that attaches to the possession of a man who settles on the public lands open to settlement. Before such a man has paid for his land, or proved up his settlement, he has a clear right of possession; he is on the land in conformity with law. If he sell his possessory right, and give up his improvements, the sale has usually been held a sufficient consideration to uphold a contract for the purchase money. But if the sale was by deed, the deed conveyed no interest in the land. Nor is this the case of a man who has entered land, paid the government for it, received a certificate of purchase, and waits the action of the proper departments of the government for his patent, for such person has an equitable title which, if there be no error, will ripen without any action of his into a perfect legal title. His possession is lawful, and his right to the land absolute, though his legal title may not be perfect. This case is also clearly distinguishable from those cases where claims of title are pending before boards of commissioners, and are ultimately confirmed, as in *Landes v. Brant*, 10 Howard, 348. In such cases the decision confirms a preëxisting right, and the decision is carried into effect by a patent evidencing the preexisting right; and intermediate conveyances are upheld on the ground probably (although in some cases other reasons are

given,) that the right had vested before the issue of the patent, and the patent was but the solemn and formal evidence furnished by the government of the existence of the right to the land, and as to intermediate conveyances, with covenants of warranty or seisin, the title reverted back to the time when the right accrued. Nor is this like a case where a man sells land to which he may have no right in law, and the purchaser is admitted into possession, and ultimately through that possession obtains a title, and he is sued for the purchase-money and attempts to set up these facts in defense, and will not be allowed to do so, because he cannot set up a fraud in which he participated as a bar to a recovery, as in *Fackler v. Ford*, 23 Howard. We have adverted to these different classes of cases, as we have been referred to them as upholding the title of plaintiff in error.

In this case when the deed was made the railroad company had neither the legal title nor the possessory right to a foot of the land sold. It could not have gone onto it without being trespassers. So far as the court can know it might never have obtained a right to any of the land, even had the government observed all the provisions of the treaty and the stipulations of the contract between the company and itself; for it was possible that the land would all be absorbed by the Indians who might elect to hold in severalty, as authorized by the treaty— not the tract in controversy only, but all the land in the reserve. A mere possibility is not the subject of a deed unless it be coupled with an interest: *Jackson v. Catlin*, 2 Johns., 258; *Fairbanks v. Williamson*, 7 Maine, 96. There was in this instance a possibility, one which has developed into a very substantial entity. It is difficult to determine whether it was coupled with a subsisting interest. We are inclined to think it was not. It was one of those speculative chances that may result in splendid realities, or prove barren in its consequences. If such was its character the land was not then the subject of contract at all between the parties, that is, of a legal, binding contract, capable of being enforced. It is true that the company had accepted the terms of the treaty as offered it by the Secre-

tary of the Interior, had given the bond required, had entered into an executory contract to take the residue of the land and pay therefor $2.50 per acre. But it was to get no lands, and make no payments, until it was ascertained whether there would be any lands for it to get, and where those land were was determined. By the treaty the company was offered the opportunity to purchase in preference to others; it had accepted the offer, and bound itself to comply with the conditions upon which it was offered, and this was all. It had no right to an acre of land. No title, no possession. It had a mere possibility, dependent upon conditions not under its control, as well as upon conditions that it had to perform. In this situation it is clear that the company could make no legal conveyance of the land. It is possible that a contract for the sale of the land, executory in its character, made in good faith, for a valuable consideration, would be enforceable in equity, when (if ever) the company became the owners of the land. Such is not this case. There was no consideration. The inducements to make the deed were inherently vicious. The purchaser took his deed with a full knowledge of the condition of the title, and must stand upon the title he took. No court could find an equity in it, and of course would not enforce it. The plaintiff in error is in no better condition than his brother was when he took the deed from the company. He purchased with a full knowledge of the facts, paid nothing, and took nothing. The court correctly decided that the plaintiffs were entitled to the land.

This conclusion on the main question in controversy also settles many of the exceptions made on the taking of the evidence. The paper mentioned in the 18th finding of fact has nothing to do with this case. It was made in May, and it is claimed that thereby the plaintiffs released their interest in the land, when the title to the land did not accrue till December afterward. To claim that this was a release of the land title so obtained is absurd. This settles quite a number of objections as to the admission of testimony.

The petition was for the recovery of land for rents and profits, and for timber cut and carried off from it. It is insisted that

Haas v. Fenlon.

there is a misjoinder as to this last cause of action. Supposing this to be true, (which is not conceded,) the plaintiff in error cannot take any advantage of it, as he has waived it. The improper joinder of several causes of action is cause for demurrer: Code, § 89, 5th clause. This defect, if it be one, was apparent on the face of the petition. Plaintiff did not demur, and thus waived the defect: Code, § 91.

Another objection is, that the court found the rental value of the land up to the time of the judgment. We do not so read the finding. It is to be presumed that the finding of a court is confined to the issues in the case, and this presumption will hold unless the contrary clearly appears. When the court finds the rental value from the time when the plaintiffs' title was perfected, at a certain sum, it is a fair presumption, and not inconsistent with the language used, that it was from that time till the suit was brought. To construe it as running up to the time of the judgment is to infer that the court erred, without a certain ascertainment of that fact from the record.

We have examined the whole record, and expressed our views upon a few of the errors alleged, and have found no sufficient cause for setting aside the judgment. It is affirmed.

All the Justices concurring.