## THE SOLOMON RAILROAD COMPANY v. JACKSON S. JONES.

1. CASE, *Followed.* The case of the *Solomon Railroad Co. v. Jones*, 30 Kas. 501, referred to, and followed.

2. RECEIPTS, *Prima Facie Evidence; When Not Conclusive.* Where an employé at work upon the construction of a railroad signs pay-roll receipts, such receipts are *prima facie* evidence of all the statements therein, but are open to explanation by the party giving them; and where such a party testifies that he did not read the receipts, or either of them, and had no opportunity so to do, because at the time he signed them there were too many men waiting to be paid off, and there was no time for him to read the receipts, it cannot be said as a matter of law that the receipts are conclusive evidence against the party giving them.

3. EVIDENCE—*Employment of Witness—Error, not Material.* In an action against a railroad company to recover damages for personal injuries, where one of the principal disputed questions is, whether the plaintiff at the time of the injury was in the employ of the railroad company sued, or of a contractor constructing the road, it is error for the court to permit the general question to be asked of plaintiff: "In whose employ were you at the time of your injury?" But where the witness, upon further examination, narrates in detail all the facts and circumstances connected with his employment, *held*, the error not material.

4. COMPROMISE—*Written Offer as Evidence.* A letter to the superintendent of a railroad company containing a brief statement of the injuries of a party, alleging that he was damaged $500, but rather than go to law would settle for $200, if the matter was closed up at once, written before the commencement of an action against the company by an attorney

who afterward appears in the cause for the plaintiff, is not evidence of the facts admitted therein, unless it be proved that the plaintiff authorized the letter to be written.

5. DECEASED WITNESS, *Testimony of, How Proved.* The testimony of a deceased witness at a former trial may be proved by anyone who heard and can remember his evidence; and it is sufficient to prove the substance of what the deceased witness testified to on the former trial; and it is not necessary to prove his exact words.

6. ———— *Testimony of Dead Witness, How Reproduced; Jury.* Where an attorney who was present at the former trial, representing one of the parties in the case, is called to give in evidence the testimony of a deceased witness at that trial, he may refresh his recollection from the bill of exceptions, or read from the bill of exceptions purporting to contain the testimony of the deceased witness at the former trial, if he shows that he examined the bill and assisted in its preparation at the time it was made, and knew, when the matters therein contained were fresh in his memory, that the bill stated what the deceased witness testified to on the former trial. In such a case, the testimony of the deceased witness embraced in the bill of exceptions and sworn to be correct by a person present at the former trial, who heard the evidence of the dead witness, goes before the jury in connection with his oral testimony. The correctness of the evidence thus presented may be disputed, and the jury must pass upon it.

7. ———— *Exclusion of Testimony, no Error.* While two employés were working the handles of a hand-car upon the track of a railroad company, which car had been damaged by a severe collision with another hand-car the day before, the handles at both ends broke at the same time. The breaks were within the iron rings or clasps circling the handles. In an action to recover damages, brought against the railroad company by one of the employés injured by the breaking of the handles, it was claimed by the employé that there was no proper examination or inspection of the handles after the collision by the servants or agents of the railroad company. The company, to establish that there was no necessity for putting the car through a rigid inspection after the collision, offered to prove by the foreman in charge of the car at the time of the collision that he had no reason to apprehend that the handles had sustained any injury, and that he did not suspect that the handles had been injured by the collision. The evidence was rejected. *Held,* That in this there was no error, as the witness was permitted to testify as to all the facts relating to the handles, and to his own acts and the acts of the other parties on the car at and after the collision.

8. AGENT, *Testifying for Principal; Interest; Instructions.* A trial court ought not to instruct or suggest to a jury that the servants or agents of a railroad company, who are called as witnesses, have any such interest, simply because they are the servants or agents of the corporation, as affects their

testimony; there is no legal presumption against the testimony of the servants or agents of a railroad company, simply because they are such servants or agents, and special instructions that they have an interest, or *no* interest, simply because they are such servants or agents, sufficient to affect their testimony, are wholly unnecessary.

9. JURY—*Findings*—*Interpretation.* If possible, the findings of a jury should be so interpreted as to support the general verdict, rather than given an interpretation which would overturn and destroy it.

*Error from Mitchell District Court.*

ON July 8, 1880, *Jackson S. Jones* filed his petition against *The Solomon Railroad Company* as follows, court and title omitted:

"The said plaintiff complains of the Solomon Railroad Company, defendant herein, for that the said defendant being a railway corporation, organized under the laws of said state before and at the time of the committing of the grievances hereinafter mentioned, and then was the owner of a certain railroad running from Solomon City in said state to Beloit, therein, and was the owner of a certain hand-car used on the track of said railroad in propelling materials for, and men engaged in, the construction of and making repairs upon said track; that the said plaintiff on the 19th day of November, 1879, at Beloit aforesaid, at the time of the committing of the said grievances, was in the employment of the said defendant as a workman, engaged in the construction of and making repairs upon said track; and that it then and there became and was the duty of the said defendant to procure a good, safe and secure hand-car to move, propel and carry this plaintiff from place to place on the line of said railroad in the performance of his duty in and about said employment, and to propel and carry the tools and materials used by said plaintiff in the construction of and making repairs upon said track, yet the said defendant not regarding its duty in that behalf, conducted itself so carelessly, negligently and unskillfully, that by and through the carelessness, negligence and default of the said defendant and its servants in providing, using and suffering to be used an unsafe, defective and insecure hand-car for the purposes aforesaid, and for want of due care and attention to its duty in that behalf, on the said 19th day of November, 1879, aforesaid, and whilst the said hand-car was in the use and service of the said defendant upon said railroad, and whilst the said plaintiff was on the same, acting in the capacity

and employment aforesaid, for the said defendant, the handle of said hand-car, by reason of the unsafeness, defectiveness and insecurity thereof, broke, whereby this plaintiff was thrown violently therefrom and in front thereof, while the said hand-car was in motion, and the same passed over the prostrate body of this plaintiff, greatly injuring and wounding him, breaking one of his legs and greatly injuring the other, as well as bruising and injuring him in the back, hips, and in divers places upon his body, and in consequence thereof this plaintiff became sick and permanently disabled, and has so remained ever since that. day, and was put to great expense in and about endeavoring to cure said injuries, and also during all that time was unable and still is unable to perform any work or labor of any kind, and has been ever since and still is prevented from attending to his ordinary business, and has been and now is thereby permanently deprived of the use of his members to his great damage, to wit, to the damage of said plaintiff in the sum of ten thousand dollars.

"Wherefore, he prays judgment against the said defendant for the sum of ten thousand dollars, his damages so sustained as aforesaid, and the costs of this suit."

On April 30, 1881, the defendant filed an answer containing a general denial. At the December Term of court for 1881 the case was tried before the court, with a jury, which resulted in a verdict and judgment for plaintiff for $4,250. The case was taken to the supreme court of the state by the Solomon Railroad Company. At the July Term of that court for 1883 the judgment was reversed, and the cause remanded for a new trial. The case was again tried, at the March term of court for 1884, before the court, with a jury. The jury found in favor of plaintiff, and assessed his damages at $5,750. They also made the following special findings:

"1. Was the Solomon Railroad Company the owner of the hand-car mentioned in plaintiff's petition, and upon which he was riding and working when he received the injury complained of? A. No, to first interrogatory; to second, but furnished it.

"2. Did not the Kansas Pacific Railway Company own and furnish said car to be used in the construction of the road? A. We believe the K. P. owned it, but the defendant furnished it.

"3. Was not the hand-car, at the time plaintiff was injured and on the day previous thereto, operated and controlled and under the direction of Patrick Cregan? A. Yes.

"4. Did not P. O'Riley have the direction and control of Cregan and the men working under him in the construction of the railroad from the time plaintiff was employed upon such construction and until he was injured? A. Yes.

"5. Did P. O'Riley employ the plaintiff to work in the construction of the Solomon Railroad sometime in the month of September, 1879, and did the plaintiff work under said employment? A. Yes.

"6. Did defendant company enter into the contract in writing with J. P. Usher in evidence in this case for the construction of its railroad at the date of said contract? A. Yes.

"7. Did not J. P. Usher assign the contract described in the preceding interrogatory to D. M. Edgerton? A. Yes.

"8. Did the Solomon Railroad Company ever make any other arrangement for the construction of its railroad than as provided in the contract mentioned in the last-preceding interrogatory? If so, state what. A. The evidence does not show that it did.

"9. Did not D. M. Edgerton, as assignee of the contract described in the preceding interrogatories, engage the Kansas Pacific Railway Company to construct the said railroad from Minneapolis to Beloit? A. No evidence to show that he did.

"10. Did not the Kansas Pacific Railway Company undertake the construction of said railroad from Minneapolis to Beloit, and did not said company actually construct said railroad during the year 1879? A. No.

"11. Did not the Kansas Pacific Railway Company employ P. O'Riley, Pat Cregan, E. C. Smeed, Samuel Mallison and others to superintend the construction of said railroad between Minneapolis and Beloit? A. They did send such men to report to Edgerton.

"12. Did not P. O'Riley employ the plaintiff Jones sometime in September for the Kansas Pacific Railway Company to labor in the construction of said railroad, and did not plaintiff work under said employment until the time he was injured? A. No.

"13. Had P. O'Riley any authority to employ plaintiff for and on account of the Solomon Railroad Company; and if you say yea, state how, when and from whom he derived such authority? A. 1. Yes; 2. From Edgerton; 3. In September.

"14. In the construction of said railroad between Minneap-

olis and Beloit, was not D. M. Edgerton present upon the work or in its vicinity until the road was constructed to the north county line of Ottawa county, sometime in the month of October?    A. Yes.

"15. Was not D. M. Edgerton during the time he was upon the work west of Minneapolis engaged by the Kansas Pacific Railway Company to render his services in behalf of said Kansas Pacific Railway Company in its construction of the work, and did not the Kansas Pacific Railway Company pay him for such work?    A. We believe from the evidence they did not.

"16. Did not D. M. Edgerton agree with the Kansas Pacific Railway Company that if it would undertake to construct the road between Minneapolis and Beloit, he would turn over and pay or cause to be paid to such company the compensation for such construction that was to be given by the Solomon Railroad Company in accordance with his contract with that company?    A. We do not know by the evidence what the arrangement was.

"17. After the road was constructed to Beloit, was not the Kansas Pacific Railway Company paid for its outlay in the construction, the compensation remaining to be paid under the contract with John P. Usher and assigned to Edgerton?    A. We do not know.

"18. Did not the plaintiff while he was employed upon the work, receive pay for his labor from the Kansas Pacific Railway Company?    A. From the evidence he did not.

"19. Did he not execute his receipt in evidence to the Kansas Pacific Railway Company for the money due him for his work in September and October?    A. They were Kansas Pacific forms, but not necessarily K. P. receipts.

"20. Withdrawn by order of court at request of defendant, because it was admitted on the production of the receipt set out on page 399, that plaintiff did not receive a pay-check for his services for October; 1879.

"21. Did not the Kansas Pacific Railway Company tender him its pay-checks as and for all unpaid services which he had performed upon the road in the month of November, and did he not decline to accept said checks upon the ground that the company owed him more than the pay-checks called for? A. He was tendered two forms of K. P. checks by a Solomon Railroad Company agent, and he did decline to take them.

"22. Was not the railroad upon which the plaintiff was injured, and the rolling stock, including the hand-car upon

which plaintiff was injured, in the control and possession of the Kansas Pacific Railway Company on the day that plaintiff was injured? A. We find from the evidence that it was under the control of the Solomon Railroad Company.

"23. Did the Solomon Railroad Company have in its possession or control the hand-car upon which the plaintiff was injured, at any time, and if so, state what person or persons had the control and operation of said hand-car for the Solomon Railroad Company? A. To the 1st part, yes; to 2, under the immediate control of Pat Cregan.

"24. Did the Solomon Railroad Company ever own, possess or have any hand-car or other rolling stock whatever on its railroad? If so, what? A. We find that the Solomon Railroad Company controlled all the rolling stock used in the construction of its road.

"25. Did not the Kansas Pacific Railway Company employ and pay Henry Chadd, Samuel Burkholder and Thomas McGuire to work on said railroad, and did not said Chadd and Burkholder receipt upon the pay-roll of the Kansas Pacific Railway Company for their pay? A. No. But we find from the evidence that the said Burkholder and Chadd did sign the K. P. form of pay-checks and pay-roll.

"26. Was not A. L. McLeod in the service of the Kansas Pacific Railway Company at and before the injury to plaintiff? A. No. When he was on this line we find he was working for the Solomon Railroad Company.

"27. Was A. L. McLeod ever in the service of the Solomon Railroad Company? If so, state who employed him and when and where? A. 1st, yes— employed, by Solomon Railroad Company when it was constructing its road in 1879, along the line of its road.

"28. Did not A. L. McLeod at and before the injury to plaintiff as road-master for the Kansas Pacific Railway Company have charge of the maintenance of said Solomon Railroad and the completion of the surfacing thereof, and had not such duty been imposed upon him since the 10th day of November, 1879? A. Not as road-master for the Kansas Pacific.

"29. Were not P. O'Riley and P. Cregan as foremen subject to the control of said A. L. McLeod after November 10, 1879, in directing the work upon said railroad, either in maintenance or in surfacing? A. Yes.

"30. Was not the hand-car upon which the plaintiff was injured constructed at the car shops of the Kansas Pacific

29—34 KAS.

Railway Company at Armstrong by that company, and was it not of the usual and uniform pattern of hand-cars of that company and of similar material, and had not such hand-cars before said accident been found in all respects proper and safe for the service in which they were employed? A. 1st, yes; 2, we believe them to be reasonably safe up to the time of the collision.

"31. Was there a collision of the hand-car in question the day before the accident to plaintiff, and if so in such collision did the handle which afterward broke with the plaintiff touch any part of the car with which the car in question collided? A. There was a collision. The handle did not touch the car with which it collided.

"32. When the collision occurred on the day before, was not Pat Cregan present with quite a large body of laborers under his control, and were not some of them with Cregan experienced railroad men, and did either of them suspect or have reason to suspect that the handle which afterwards broke with the plaintiff was in any way injured in such collision? A. 1st, yes; 2d, don't know; 3d, yes, had reason to suspect.

"33. How many men were at work with Cregan at the time of the collision? A. Forty to forty-five.

"34. On the day of the collision did not Cregan have and use two hand-cars and a push-car with which his men and tools were transported to and from their works? A. According to the evidence the cars were all out.

"35. Were the three cars loaded to their capacity with men and tools at the time of the collision, and were not Chadd and McGuire riding upon the colliding car? A. One to its capacity, the other empty on the track; we think they were.

"36. Did not Chadd have hold of one of the handles of that car at the time of the collision? A. Don't know.

"37. From the collision, had Chadd, McGuire or Cregan any reason to suppose that either of the lever handles were injured or weakened by the collision? A. Yes, had reason to suspect.

"38. Was not the car complained of, after the collision, operated back to Beloit, a mile or more on an up-grade, by both lever handles? A. Yes.

"39. Was not the colliding car operated back to Beloit on the night after the collision at the same speed as the other hand-cars? A. Yes, or nearly so.

"40. Did not the two hand-cars and push-car carry back

to Beloit the night of the collision all the men and tools that were brought out on them in the morning? A. Yes, with the injured car lightly loaded.

"42. Did the handle of the hand-car complained of by plaintiff break within the band of iron which enveloped it? If so, how far within? A. Yes, about one-eighth to one-fourth inch.

"43. Was not the fracture of the lever handle in plaintiff's hand a square break, and not oblique at all? A. Yes, nearly so.

"44. Was not the fracture in the handle a quarter of an inch or more within the iron band which held the handle? A. No, one-eighth to one-fourth inch.

"45. In the operation of the hand-car, after the collision, to Beloit, and on its return next morning, to the time of the accident, was there any indication or appearance that the handle which broke with plaintiff was injured or defective? A. No evidence.

"46. At the time of the breaking of the handle by Jones, did he apply increased power to the handle for the purpose of propelling the car over the crossing which he then supposed was in some measure obstructed by frozen earth? A. Yes, a little."

The defendant also submitted the following question, numbered 41:

"Was not the hand-car from which plaintiff fell and was injured, used continuously, without any repair, upon the railroad until the surfacing thereof was completed, and then removed to McPherson railroad, and there used for the purpose it was used before it was broken?"

This question the court refused to submit to the jury for answer. The defendant excepted. On March 29, 1884, the defendant filed a motion for a new trial, which motion was overruled. Thereupon the court rendered judgment upon the verdict in favor of the plaintiff and against the defendant for $5,750, together with all costs of suit. The defendant excepted, and brings the case here.

*J. P. Usher*, for plaintiff in error.

*A. H. Ellis*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This case was before us at the July term for 1883. (30 Kas. 601.) Since then a new trial has been had, resulting in a verdict and judgment for $5,750 and costs. This proceeding has been brought to reverse that judgment. The contention of the railroad company has always been that it had the right to contract for the construction of its road from Solomon City to Beloit; that it did so contract; that by the law it is not liable for the injury sustained by Jones; and that if he received injuries by the culpable negligence of any person or company, the Solomon Railroad Company is not responsible therefor. All the evidence given on the part of plaintiff below upon the former trial seems to have been again presented at the last trial; and upon that trial additional testimony was introduced by the railroad company, tending to establish that D. M. Edgerton, the president of the Solomon Railroad Company constructed the road upon his own account from Solomon City to Minneapolis, and that the Kansas Pacific Railway Company constructed the road from Minneapolis to Beloit. We are satisfied with the law as previously declared by this court upon all the questions involved in the former presentation of this case, and several of the same questions therein decided are again elaborately argued. Notwithstanding the additional or further evidence on the part of the Solomon Railroad Company at the late trial, we cannot say it was so conclusive as to overturn the verdict. The jury were the exclusive judges of the weight of the evidence and of the credibility of the witnesses, and, as we said in the former opinion, although the actual facts of the case tend to show that the "Kansas Pacific was the real builder and owner of the road," sufficient evidence was before the jury to authorize the verdict. (Solomon Rld. Co. v. Jones, 30 Kas. 601.) Deeming it useless to again discuss the questions of law settled in the former decision and now presented for reëxamination, we shall notice only the

1. Case, followed.

important matters argued which were not passed upon when the case was here before.

It is urged that, as the jury found the Solomon Railroad Company entered into a written contract with J. P. Usher for the construction of its road; and that J. P. Usher assigned the contract to D. M. Edgerton; and that as the evidence did not show that the Solomon Railroad Company ever made any other arrangement for the construction of its road, the inevitable conclusion is, that the work was constructed pursuant to the contract, or by a volunteer; and therefore that the Solomon Railroad Company is not liable to Jones, who was at work at the time of his injury on the construction. *Non sequitur*. The contract was not made public, nor did Jones have any knowledge or information thereof. Under subdivisions 1, 2 and 3 of the syllabus of the former decision, a liability might attach to the Solomon Railroad Company, although Edgerton had taken an assignment of the contract from Usher, and the company had made no other arrangement for the construction of its road.

Counsel refer to the case of *Chicago & Great Eastern Rly. Co. v. Fox*, 41 Ill. 106, as very much like the case at bar, and as an authority that the instructions of the trial court were erroneous, and also as tending to show that there was no evidence to support the verdict. In that case Fox and Howard were the owners of a pile-driver; one Vosburgh was a contractor to construct a bridge for the railway company. He applied to Fox and Howard and procured the pile-driver, and used it in constructing the bridge. Fox and Howard sought o recover of the railway company for the use of the implement and the work done by them upon the bridge. The company denied the employment, and the court very properly held that there was no evidence to support the verdict. Vosburgh, the contractor for the Chicago & Great Eastern Railway Company, was not the president or any officer of that corporation, and that case, upon the facts, is easily distinguishable from this. Here, D. M. Edgerton was the president of the corporation sued, and according to the testimony of Jones, paid him

on September 26, 1879, for work upon the construction; and when Edgerton paid him off, Jones asked "if he would want the men back again;" and Edgerton replied: "Boys, you who want to go home, can go home; and for those who don't want to go home, there is work for surfacing." Then Jones asked him "when he would commence laying track again," and Edgerton said: "Not before next week; come back then; there was work for us all." "Where the president of a corporation appears as the active agent in the execution of any work, parties employed by him have the right to assume that he is acting for the corporation, and that his acts in that respect are its acts and binding upon it." (*Solomon Rld. Co. v. Jones,* supra.)

Much complaint is made of the seventh instruction and of other like instructions, permitting the jury to find that Jones was an employé or servant of the Solomon Railroad Company at the time he was injured, if he had no notice or knowledge of employment from the Kansas Pacific Railway Company, if the jury further found that the work of constructing the road was being done with the knowledge of the president of the Solomon Railroad Company, in the name of that company, and that the president of that corporation was personally engaged in superintending and giving general directions in regard to the work and employment of the men engaged thereon. The claim is that Jones was employed about the first of September, 1879, by Patrick O'Riley, who had the entire charge of track-laying; that O'Riley was in the employ of the Kansas Pacific Railway Company; and that Jones had notice from the pay-roll receipts signed by him prior to his injuries, that he was in the employ of the Kansas Pacific, and not of the Solomon Railroad Company. We perceive no error in the instructions in this regard. Edgerton testified that while he was upon the road between Minneapolis and Beloit, he was the one who gave all the general directions concerning the construction; that he had men under him, and that he regarded himself as the boss of the work until he turned it over to S. T. Smith; that O'Riley was sent to him by the Kansas Pacific; that the

authority he conferred upon O'Riley was the immediate charge of the track-laying; and that the work was done "in the name of the Solomon Railroad Company, but for the account of the Kansas Pacific Railway Company proper."

O'Riley testified that A. H. McLeod employed him to work for the Kansas Pacific Railway Company in 1878; that he was made assistant road-master of the Kansas Pacific in May or June, 1879; that in September, 1879, McLeod ordered him to Minneapolis, to report to Edgerton or Smeed; that he went to Minneapolis and reported to Edgerton, who ordered him to report to Smeed; and that Smeed gave him entire charge of the track-laying.

As to the receipts executed by Jones to the Kansas Pacific Railway Company for his services upon the road, the following facts appear: According to his evidence, he was paid only twice while at work, and both times at Minneapolis. The first time Edgerton paid him in person, and at that time he signed the first receipt to the Kansas Pacific. This was about September 26, 1879. The second time he was paid late in October, 1879, for the work done that month, and for this also he signed a receipt to the Kansas Pacific; but his testimony shows that he did not read the receipts, nor have an opportunity so to do, and the reason he gave was that "there were too many men waiting to be paid off, and there was no time for me to read the receipts." We cannot say as a matter of law, upon the facts, that Jones had notice from the receipts that he was in the service of the Kansas Pacific Railway Company. While a receipt is *prima facie* evidence of all the facts and statements contained therein, it is open to explanation; and if Jones did not read the receipts, or either of them, and had no reasonable opportunity so to do, he cannot be bound by the contents thereof. (*Bemis v. Becker*, 1 Kas. 226; *Bridge Co. v. Murphy*, 13 id. 35; *Wolf v. Foster*, 13 id. 118; *Stout v. Hyatt*, 13 id. 243; *Railroad Co. v. Doyle*, 18 id. 58.)

2. Receipt, prima facie evidence, but not conclusive.

Our attention is specially called to the cases of *McCormick*

*v. Molburg*, 43 Iowa, 561, and *Gulliher v. Railroad Co.*, 13 N. W. Rep. 429, as laying down a different rule.   The decisions in both of these cases refer to written contracts.   In the first case, it is said in the opinion :

"In fact, no excuse whatever is given except that the defendant signed the contract, relying on the representation of the plaintiffs as to its contents.   This is inexcusable neglect, and the defendant must suffer the consequences of his own folly."

In the second case, it is said :

"The instrument in writing [under consideration] is more than a mere receipt; it is a contract of settlement, and is binding on the parties unless it was procured by fraud."

The rule applicable to the conclusiveness of a written contract does not apply to a mere receipt.   Concerning the receipts offered in evidence, the court fully instructed the jury as follows:

"41. If the plaintiff had read said receipts, it would have been presumptive evidence that he knew he was in the employ of the Kansas Pacific Railway Company.   43. A party who can read, can have no advantage from the fact that he has not read a receipt which he has signed, unless he has proof that fraud has been practiced upon him to induce him to sign it, provided he had an opportunity to read the same.   40. Though the jury may believe from the testimony of plaintiff that he did not read the receipts signed by him in evidence in the case, nevertheless it was his duty to do so before he signed them, and by law he is charged with the knowledge of their contents, the same as if he had read them, provided he had an opportunity to read the same; but he is not estopped thereby from showing the real facts in regard to such payments, if any payments were made at the time."

The inquiry was made of Jones, "In whose employ were you in November, 1879 ?"   This was objected to by the railroad company as calling for an opinion.   The objection was overruled, and an exception taken.   Jones answered, "The Solomon Railroad Company."   Similar questions arose upon

the testimony of Thomas McGuire and other

**3. Employment of witness; incompetent evidence; error, not material.** witnesses. The evidence thus obtained was incompetent. Had the question been merely preliminary, it would not have been erroneous. Although the evidence was incompetent, we do not think the error occasioned by its admission material. (*Simpson v. Smith,* 27 Kas. 565.) A large amount of similar testimony was given on behalf of the railroad company. After Jones and the other witness had stated in whose employ they were in the fall of 1879, upon direct and cross-examination they narrated in detail all the facts concerning their employment. Therefore the jury had before them all the facts as to the persons or company that employed these witnesses.

On February 3, 1880, A. H. Ellis wrote a letter to the superintendent of the Kansas Pacific Railway, at Kansas City, Missouri, asking him to refer the claim of Jones to the proper officer of his company, and to inform him of the intention of the company in the matter. This letter contained a brief statement of the injuries Jones received, and alleged that he was damaged at least $500, but rather than go to law would settle for $200, if the matter was closed up at once. The superintendent wrote in answer to Ellis on February 5, 1880, that he would have the matter investigated without delay, and advise him on receipt of report. This letter was offered in evidence in connection with the letter of Ellis. The

**4. Compromise; no error in excluding letters.** court ruled the letters out, holding that the evidence was not admissible. There was no error in this ruling. Ellis testified that "at the time he wrote his letter he had no employment or agency whatever from Jones, and that he had no authority from him at the time to write that letter, or any other letter." Jones also testified that "he did not think he ever laid his claim in for injuries with Mr. Ellis against the Kansas Pacific Company." Before the letters were competent, it was necessary to show that Ellis had authority to write the letter of February 3d.

Counsel for the railroad company cite *Marshall v. Cliff,* 4 Camp. 133; and upon that authority it is insisted the letter

of Ellis' was competent evidence in the cause. It was decided in the subsequent case of *Wagstaff v. Wilson*, 4 Barn. & Adol. 339, that—

"A letter written to the plaintiff's attorney, before action brought, by the attorney who afterward appeared in the cause for the defendant, was not evidence of a fact admitted therein, without further proof that the defendant authorized the communication."

And Park, J., in the opinion in that case, referring to *Marshall v. Cliff*, supra, said:

"The attorney's letter relied upon to prove the joint ownership of the defendants, contained an undertaking to appear for them; that was a step in the cause."

The letter of Ellis was no step in this cause; therefore the case of *Marshall v. Cliff*, cited by counsel, is clearly different from this. (Weeks on Attorneys, § 223.) Again, an attorney has no power, without express authority from his client, to compromise or settle his client's claim. (*Jones v. Inness*, 32 Kas. 177.) It was not proved upon the trial that Ellis was authorized to write his letter, or had any express authority to compromise the claim therein referred to.

It appears that Samuel Burkholder was sworn on the former trial of this cause. Having died since that trial, A. H. Ellis was sworn as a witness, and testified to the statements made on oath by Burkholder when he was a witness in the case. Among other things, Ellis testified that—

"He was present in court, and heard Burkholder's testimony given, sometime during the month of December, 1881; that at the time Burkholder testified in substance as follows."

Ellis thereupon commenced reading the printed transcript, which contained in the bill of exceptions the testimony purporting to have been given by Burkholder on the former trial. Ellis stated, if the company objected to his reading from the printed copy, he would read from the manuscript bill of exceptions; but the counsel for the company waived the production of the manuscript bill, and claimed it was incompetent for Ellis to read from either. The court thereupon overruled

the objection. Subsequently, the witness Ellis was cross-examined at great length, and upon such cross-examination testified among other things that the counsel for the railroad company prepared the bill of exceptions; that he made suggestions of amendment thereto before the trial judge at the time the same was settled. He also testified upon cross-examination that his recollection as to what Burkholder swore to on the former trial depended largely upon the transcript, but that he had an original recollection from his insight in the case, and from the fact that certain questions in the case had always seemed to be important. The company objected to Ellis stating that Burkholder swore as appeared in the bill of exceptions. The objection was overruled, and this ruling is also alleged as error. The contention is, that Ellis could not read the bill of exceptions for any purpose, nor refresh his memory therefrom. The case of *Sterne v. People*, 102 Ill. 540, is cited to the effect that the testimony of deceased witnesses at a former trial cannot be proved by the bill of exceptions taken at that trial. We may admit the doctrine announced in the above case to the fullest extent, and yet the case does not sustain the objections made to Ellis's testimony. Ellis was called to testify as to what Burkholder, the deceased witness, swore. Although he read from the bill of exceptions, he stated that Burkholder's testimony at the former trial was in substance as stated therein. Therefore the testimony of the deceased witness was given by Ellis from the bill of exceptions, supplemented with his oath as to its correctness; in other words, he read to the jury the testimony of the deceased witness as embodied in the bill of exceptions, in connection with his own oral testimony. Ellis was present at the former trial, and sufficiently interested in the case to remember the substance of the testimony, and he could have been, and was, very thoroughly cross-examined. Thus the correctness of the bill of exceptions and the other evidence of Ellis might have been disputed.

The decision in *Sterne v. People*, supra, is based upon *Railroad Co. v. Keep*, 22 Ill. 9. In that case, the witness was per-

mitted to read from written minutes what a former witness, then deceased, had testified. Before reading, he testified that he could not state the testimony of the deceased witness minutely from his recollection, but must rely upon his minutes taken at the time, and which he believed were correct, and then read from the minutes the testimony of the deceased witness. Breese, J., in that case said:

"What better evidence of the testimony of a deceased witness could there be than correct notes of it taken at the time? It fulfills one of the most important requirements of the law that the best evidence shall be produced in the power of the party to produce. If not truly taken and reported, it is open to attack and exposure from the other side, whose counsel may also have taken full notes; or the judge who tried the cause may be sworn and his notes used for such purpose; or any one or more of the jurors or bystanders who heard the case may be examined as to their fidelity and correctness. It seems to us that such minutes, sworn to be correct, are far better and more satisfactory as evidence than the imperfect and fleeting recollection of any man could possibly be; and we do not feel the force of a reason which shall require us to reject a higher for an inferior grade of testimony."

The bill of exceptions, which contained in great detail the evidence of Burkholder on the former trial, was prepared when the matters therein stated were fresh in Ellis's memory, and as he examined the same before it was signed by the district judge, and made suggestions of amendments, he was in a condition to say whether he believed it correct. We think he had the right to rely upon the bill of exceptions, which he assisted in preparing, the same as if it were the minutes of the testimony of the deceased witness taken by him upon the former trial; and in *Railroad Co. v. Keep*, supra, it was decided that "the written memorandum taken at the time the deceased witness testified in the suit between the same parties may be read in evidence; the correctness of such memorandum may be disputed, and the jury must pass upon it." In *Sterne v. People*, supra, nothing was offered in evidence, excepting the bill of exceptions, purporting to give the testimony of the deceased witness.

6. Testimony of dead witness, how reproduced; jury.

The evidence was properly ruled out, because it was not cer-
tified to by oath of any witness, and there was no person to
be cross-examined as to the accuracy of the bill.

In *Halsey v. Sinsebaugh*, 15 N. Y. 485, it was decided that—

"The minutes of the testimony of a living witness, taken
by counsel upon a former trial, who produces them and swears
he has no doubt of their correctness, but has no recollection
independent of the minutes, may be read by him to impeach
another witness."

In that case, Selden, J., says:

"It is well known that the efforts of memory are seldom
equal to the task of recollecting evidence any considerable
lapse of time, even the exact substance of words and phrases;
while it would be comparatively easy at the time, or imme-
diately afterward, to make a correct record of their import.
To exclude such a record, when shown to have been honestly
made, would be to reject the best and frequently the only
means of arriving at the truth."

Another objection is, that Ellis was not a proper witness as
to Burkholder's testimony on the former trial, because, it is
alleged, that upon cross-examination it appeared testimony was
given by Burkholder upon the former trial which Ellis did
not remember.    It was held in *Cannon v. Stevens*,
13 Kas. 447, that "it is sufficient to prove the
substance of what a deceased witness testified to
on a former trial, and not necessary to prove his exact words."
Now while it is contented that upon cross-examination Ellis
qualified his general statement given on direct examination
that Burkholder testified in substance thus and so, it is clearly
evident from reading all the cross-examination that Ellis gave
the substance of the testimony of Burkholder upon every
subject about which he testified, or which he was called to
prove, and his testimony was sufficiently positive as to what
Burkholder had testified to on the former trial to make it
competent. ( *Carrington v. Ward*, 71 N. Y. 364; *Blake v. The
People*, 73 id. 587; *Helper v. Bank*, 97 Pa. St. 420.)

In the case of *Harrison v. Charlton*, 42 Iowa, 473, cited,
the witness testified he could not remember the testimony given

*5. Deceased wit-
ness, testimony
of, how proved.*

by the deceased witness upon cross-examination; therefore he was held incompetent. In this case, the bill of exceptions which Ellis read and from which he refreshed his recollection contained not only the direct examination of Burkholder, but also his cross-examination, his redirect examination, and his recross-examination; and in connection with the bill of exceptions, Ellis testified that "he knew in a general way and in nearly all particulars the record of Burkholder's testimony was, when originally prepared, substantially correct, and that he made this statement from what, when the matter was fresh in his memory, he believed to be true." He explained his expression, "That the bill of exceptions did not contain all his [Burkholder's] testimony," to mean "it did not contain all the words of his [Burkholder's] testimony, nor his exact words; but that it was the substance of all Burkholder testified to upon the subjects which he [Ellis] was called to prove."

On November 18, 1879, the day before the injury complained of, there was a collision between the hand-car upon which Jones rode on November 19th, and one of the others. The collision was violent enough to shatter the lifting-handles of the car. It was the contention of Jones that the handles were fractured by the collision, and that the railroad company was negligent in not giving them proper inspection. It was shown by the evidence that the handles which broke with Jones on November 19th were worked back to Beloit, on the evening of November 18th, just after the collision, and that Cregan was the foreman in charge of the hand-car; and the railroad company contended that such use was equivalent to a reasonable inspection of the handles. Cregan, the foreman in charge of the hand-car, was asked by the company: "Q. When these cars came together, had you any reason to apprehend that the lever handles had sustained any injury?" And also, "When these cars came together, did you suspect that the lever handles had been injured, or could be injured by such collision?" Subsequently the company sought to show by O'Riley, who had charge of the hand-car, and had had charge of hand-cars like it ever since he came on the road in 1878,

and of hand-cars generally since 1857, that if after the collision the hand-car was worked by the lever handles a mile and a half back to Beloit, carrying ten or twelve men, with their tools, such use was equivalent to an inspection of the handles, and that after such use no other inspection was necessary. Similar evidence was sought to be introduced by other witnesses, who claimed to be experts in that regard. The handles were simple pieces of wood surrounded at two places with iron bands holding them together, and we do not perceive that any expert testimony regarding them was necessary — at least there was no error in the rejection of the testimony offered. The witnesses testified what occurred after the collision, and all that was done by Cregan and the other employés upon the car; and E. C. Smeed, the chief engineer of the Kansas Pacific, was permitted to testify as follows:

7. No error in excluding testimony.

"Q. Take the hand-car — what inspection is necessary and how is it performed? A. Look it over, and take hold of it, and feel it, and see if you can feel anything that is weakened, and give it a general looking over; see if the car has been disarranged out of a square; striking on one side; look it over and see if there is any apparent weakening of the car. I think that is all the inspection that would be necessary — it is all the inspection that would be necessary. Q. Is that all that is usually given? A. Yes, sir."

He was also permitted to state what he considered a test of any part of the car. It is the general rule that witnesses must speak the facts, and they are not allowed to give their opinions unless they are experts, and then only upon questions of science and skill. (*Monroe v. Lattin*, 25 Kas. 351.) It was competent for Cregan to speak as to all the facts relating to the handles and to his own acts and the acts of the other parties upon the hand-car after the collision; but the particular questions asked him were properly ruled out. The court charged the jury as to the inspection of the handles of the hand-car, as follows:

"10. The jury are instructed that it is the duty of a railroad company to make reasonable efforts to supply to its em-

ployés safe and suitable machinery, tools and appliances for their use in and about its employment, and also after having so supplied the same, it is its duty to make reasonable efforts to keep such machinery in a safe and serviceable condition, and to that end must make all needed inspections and examinations."

"18. If the jury should believe from the evidence that the working-handle of the hand-car which broke with Jones was injured the day before in the collision, then the jury are instructed that the mere fact, if it was a fact, that such injury so caused by such collision was not apparent to the eye, would not relieve the employer from the duty of inspection, if the nature of the patent injuries and the force and circumstances of the collision were such as to indicate that latent injuries had been caused by such collision, if in fact such latent injuries could have been discovered by a proper inspection."

"20. The jury are instructed that the defendant cannot relieve itself from any duty, if any duty it had, to cause an inspection to be made of the hand-car, by showing that some employé or employés, who had no duty to perform in respect to the hand-car, did not suspect that the same was injured or had any undiscovered defect, even though such employé or employés had as good or better means of knowledge in regard to the condition of the hand-car as the person or foreman whose duty it was to make any needed inspection of it had. It is for the jury to determine from all the evidence and circumstances whether ordinary prudence required an inspection of the hand-car after the collision and before again using the car."

"15. If the jury find from the evidence that the hand-car in question was suitable for the purposes for which it was designed and used ; if it collided the day before with another hand-car, in which condition it is alleged that the lever handles became fractured, and at which supposed fracture one of them afterward broke in the hands of the plaintiff, whereby he was injured, yet if the jury believe from the evidence that the fracture of the handle was within and under the loop of iron in which it was placed and not in view, and that said car after the collision was operated, and the handles used with a load a mile or more on an up-grade, and that the handle during such operation was to all appearances firm and unbroken, and that one or more who had witnessed the former collision had no apprehension that the lever handle was injured in such collision — if such facts are proved, it is for the jury to say

from these and all other evidence and circumstances in reference thereto, whether the party operating said car ought to have reasonably supposed that there was a latent fracture of the handle within the loop, and it is also for the jury to say whether it was the duty of the party to reasonably apprehend that there might be such latent fracture.

"15½. If the handle which broke with Jones was worked back to Beloit on the evening of the collision, from the place of the collision, with the knowledge of the foreman in charge of said hand-car, and if in the opinion of the jury such was equivalent to a reasonable inspection of said handle, then the jury are instructed that no special inspection of said handle was necessary after such use."

"25. If the handle of the car had been fractured the day before within the loop of the iron in which it was held so as not to be discovered 'in the exercise of ordinary care' by the parties directing the plaintiff and the use of the car, and if the same was unknown to such parties, there was no fault in them in not discovering that the handle had been fractured."

"27. If the jury believe from the evidence that the hand-car upon which the plaintiff was injured was in all respects of the same make and pattern as respects kind and quality of timber, material and construction as the other hand-cars used by the company operating the railroad, and if such other hand-cars in use were found to be in all respects proper and suitable, then the jury have the right to presume, and ought to find, that the car when brought upon the road and furnished the employés for use was good and sufficient; and although it is alleged and testimony has been given that the hand-car in question collided with another hand-car with more or less violence on the day before the accident to plaintiff, yet such fact will not vary the case, and create a liability upon the company operating the hand-car, unless it is shown that the collision fractured the handle which broke with plaintiff, and that the company had notice that the handle was injured, or that the servant or agent of the company whose duty it was to look after the car had, or reasonably ought to have had, such notice."

The railroad company requested the court to instruct the jury as follows:

"No suspicion attaches to the testimony of any witnesses because they are the servants or agents of the Union Pacific Railway Company—they have no such interest as requires them

30—34 KAS.

to be dealt with differently than any other witnesses in the case."

We think that this instruction was properly rejected. The case cited to sustain the instruction is *Railroad Co. v. Kirkwood,* 45 Mich. 51. In that case the trial court told the jury if they found it necessary to consider the testimony given by the agents or employés of the railroad, they should bear in mind the interest they have in protecting the company and shielding themselves from blame. That case is no authority for the instruction refused. A trial court ought not to suggest to a jury that the servants or agents of a corporation, who are called as witnesses, have any such interest simply because they are servants or agents, as affects their testimony. There was no legal presumption against the testimony of the servants or agents of the railroad company simply because they were such servants or agents; and special instructions that they have *an* interest, or *no* interest, in the case sufficient to affect their testimony, were wholly unnecessary.

8. Agent testifying for principal; interest; instruction, properly rejected.

Great complaint is made of the answers of the jury to several of the special findings. It is said by counsel that some of the answers of the jury are not true, and others evasive and unsatisfactory. The answers generally complained of are those regarding the constructing of the railroad from Minneapolis to Beloit; and as to whether the Kansas Pacific Railway Company had in its employ, at the time of the injury complained of, O'Riley, Cregan, Smeed, Mallison and others, to superintend and work upon the construction of the road. Counsel, in the arraignment of the jury, seemed to forget that although the Kansas Pacific was the real builder and owner of the road, yet the president of the Solomon Railroad Company appeared as the active agent in the execution of the work, employed parties upon the construction, and had the general charge thereof at the time Jones was employed, and for more than a month thereafter. It is apparent that the jury answered many of the special findings upon the theory that the Kansas Pacific constructed the road in the name of the Solomon Railroad

Company, or rather, that the Kansas Pacific was the backer of the Solomon Railroad Company, and furnished that company men, money, materials, etc., for the construction and operation of its road; hence the findings of the jury regarding the construction of the road and the employment of superintendents, foremen and other persons, must be viewed in that light. The question is, whether there was sufficient evidence before the jury to sustain this theory. D. D. Hoag, who was secretary of the Solomon Railroad Company at the time the road was constructed from Solomon City to Beloit, testified, among other things, that—

"He did not know whether Mr. Edgerton attended to the construction of the road as president of the Solomon Railroad Company, or as contractor; that after the road got to Minneapolis, Edgerton turned it over to S. T. Smith, the general superintendent of the Kansas Pacific, but Edgerton seemed to have the general management over the employés of the Kansas Pacific as long as he stayed upon the road; and that he stayed there until the road was completed beyond Delphos, some fourteen miles from Minneapolis; that he knew that Edgerton held the contract for constructing the road, but he did not know who was doing the work."

James R. McClure, Esq., one of the directors and vice president of the Solomon Railroad Company from its organization to the completion of the road to Beloit, and the legal adviser of Mr. Edgerton, and also the attorney of the company up to the completion of its road to Beloit, testified that—

"The road was completed to Beloit by Mr. Edgerton; that it was generally understood that Mr. Edgerton built the road; and that it was generally known throughout the length of the road that Mr. Edgerton was the president of the Solomon Railroad Company."

E. C. Smeed, the chief engineer of the Kansas Pacific Railway Company at the time the Solomon railroad was constructed, testified that—

"D. M. Edgerton was never his superior officer on the Solomon road; that he (Smeed) was employed on the work of building the road from Solomon City to Minneapolis; that he laid out the entire line for the road, and that he had the con-

trol and did all the work on the Solomon line for the Kansas Pacific; that while the work was being constructed from Solomon City to Minneapolis, he was not under D. M. Edgerton, and at the time D. M. Edgerton had no control over him; that Edgerton had no more control over the work between Solomon City and Minneapolis than between Minneapolis and Beloit; and that there was no change in Edgerton's relations to the road, or in fact of his being along the line of the road, that he knew of, until the road was completed to Beloit."

Edgerton testified that—

"After the contract between the Solomon Railroad Company and Judge Usher was assigned to him, he proceeded to construct the road under it, and that he constructed the road on his own account from Solomon City to Minneapolis; that the construction stopped there for one year; that then Mr. Gould and other directors and officers of the Kansas Pacific Railway Company requested him to proceed with the construction of that road for their account, and they would furnish the materials, supplies, money and everything; that he then went on to build from Minneapolis to Beloit; that this was done with men, material and means furnished by the Kansas Pacific Railway Company, and by him so built under the directions of the officers of the road."

It is clearly established that after the Solomon road was constructed to Minneapolis the Kansas Pacific Railway Company operated the same in the name of the Solomon Railroad Company, and Edgerton testified that "the Kansas Pacific charged the Solomon road for the use of motive power and rolling stock; that the Kansas Pacific paid all the expenses of operating the road, but credited the Solomon road with a division of the earnings;" and at one time in his testimony, Edgerton stated that "the work on the road was done in the name of the Solomon Railroad Company, but for the account of the Kansas Pacific Railway Company."

Upon the whole record we think there was evidence before the jury to sustain the theory that while the Kansas Pacific furnished the men, money, materials, etc., for the building of the Solomon road, the president of the Solomon Railroad Company was such an active agent in the execution of the work, that for all the purposes of this case the railroad was

built in the name of the Solomon Company; therefore, that the findings of the jury regarding the construction of the road and the employment of the men thereon cannot be said to be untrue, or in conflict with the weight of evidence. If the Kansas Pacific acted for the Solomon Railroad Company, the findings may be easily harmonized. If possible, the findings of a jury should be so interpreted as to support the general verdict, rather than given an interpretation which would overturn and destroy it. (*Simpson v. Greeley*, 8 Kas. 586; *Mo. Pac. Rly. Co. v. Holley*, 30 id. 465; *St. L. & S. F. Rly. Co. v. Ritz*, 33 id. 404.)

9. Jury; findings, how to be interpreted.

The following matters are not contradicted:

*First.* The Solomon Railroad Company was organized in 1877, with D. M. Edgerton as president, and he continued to occupy that office until some time after the injury complained of. He was also vice president of the Kansas Pacific Railway Company.

*Second.* The road was constructed from Solomon City to Minneapolis, and from Minneapolis beyond Delphos, while Edgerton was president and active in the execution of said work.

*Third.* The Kansas Pacific Railway Company was the owner of twenty thousand shares of stock in the Solomon road, which included all of the stock of the company outside of township and county subscriptions and a few shares issued for services.

*Fourth.* Jones, at the time of his injuries, was at work upon the construction of the road between Minneapolis and Beloit.

*Fifth.* Without any fault or negligence upon his part, the handles of the hand-car which he was working broke, in consequence of which he fell out in front of the car, was run over and injured.

*Sixth.* The hand-car, the handles of which broke with Jones on November 19, 1879, had a violent collision on the day before with another hand-car.

*Seventh.* Jones was not present on November 18, 1879, and knew nothing of the collision.

The principal disputed questions in the case upon the trial were: *First*, Were the injuries of Jones caused by the negligence of the employés or agents of any railroad? *Second*, Was the Solomon Railroad Company responsible for such injuries, if caused by negligence? All that was said by this court in *Solomon Rld. Co. v. Jones*, supra, as to the testimony warranting a finding of negligence, applies here. Also, much therein stated as to the liability of the Solomon Railroad Company is again applicable. It is somewhat difficult, from the record, to determine the exact relations which existed between the Kansas Pacific and the Solomon Railroad Company during the construction and operation of the Solomon road. As the Solomon Railroad Company was organized for the purpose of constructing a road from Solomon City to Beloit, the work will be presumed, in the absence of any showing to the contrary, to have been done by it; and we think there was sufficient evidence before the jury authorizing them in holding that company responsible for the negligence of the employés or agents causing the injuries complained of.

We have already referred to the findings of the jury that the Solomon road entered into a contract in writing with Judge Usher for the construction of its road, and that subsequently Judge Usher assigned this contract to D. M. Edgerton, who was president of the Solomon road; and nothing further need be said concerning that matter, except to state that D. M. Edgerton never made any written assignment of the Usher contract to the Kansas Pacific, and never entered into any formal writings with the company, on his own account, or in the interest of the Solomon road, for the construction of the road to Beloit.

If the Kansas Pacific was the sole contractor for the construction of the Solomon road from Minneapolis to Beloit, and as such contractor did construct that part of the road in its own name and upon its own account, it is exceedingly strange that James R. McClure, Esq., the legal adviser of Edgerton and the attorney of the Solomon Railroad Company, was wholly unacquainted with the arrangement. He testified that the

Solomon Railroad Company never made any other arrangement for the construction of the road than the one made with Judge Usher, and subsequently assigned to Edgerton. He also stated that if any other arrangement had been made, as one of the directors and vice president of the Solomon road he would have known about it. After the road was completed to Beloit, acting upon the assumption that Edgerton, and not the Kansas Pacific, had built the road, McClure commenced an action in this court in the name of the Solomon Railroad Company against the board of county commissioners of Mitchell county, for the benefit of Edgerton, to compel the board of commissioners of that county to issue the bonds voted to aid in the construction of the road. Taking into consideration all the facts and circumstances developed upon the trial, there is some force in the suggestion of the counsel of Jones, that—

"The officers of the Kansas Pacific Company, being the owners of stock of the Solomon Railroad, went on and built it, not as independent contractors in the name of the Kansas Pacific, but as officers and stockholders of the Solomon Company, allowing one of their corporations to loan and furnish to the other, materials and supplies, well knowing that they, being the officers of both companies, had it in their power to compel a settlement and restitution."

In the case of the *A. T. & S. F. Rld. Co. v. Davis*, ante, p. 209, upon reëxamination of the principal question involved in that case, we held that where the parent railroad company assists another railroad company in constructing its road, under the provisions of chapter 105, Laws of 1873, such parent company is not responsible for the negligence or default of the auxiliary company.

Finally, it is urged that the damages of $5,750 are excessive. As the handles of the hand-car broke while Jones was working the same, he fell out backward in front of the car, and was run over and severely injured. According to his testimony, the injuries to his back and leg are permanent. There was sufficient evidence, if the jury believed Jones and

the witnesses introduced in his behalf, to fully sustain the verdict.

A great many other questions are presented and argued in the briefs. We have examined them with considerable care, but find·no sufficient error therein to set aside the verdict, or reverse the judgment.

The judgment of the district court will therefore be affirmed.

. All the Justices concurring.