THE SUN INSURANCE OFFICE OF LONDON, ENGLAND, V. THE WESTERN WOOLEN-MILL COMPANY.

No. 14,269.    ( 82 Pac. 513.)

SYLLABUS BY THE COURT.

1. EVIDENCE — *Ultimate Fact — Conclusion of the Witness — Error Cured.*  It is error to permit a witness to testify to the ultimate fact to be determined by the jury, or to give his opinion in answer to an inquiry embracing the whole merits of the case; but where, upon further examination, he relates in detail the facts and circumstances upon which his opinion or statement is based the error may become immaterial.

2. ———— *Fire-insurance—Expert Testimony.*  Wool merchants and manufacturers who have had years of experience in their business are competent to give opinions based upon facts falling within their experience, such as the effect of water on a large mass of wool and the probability of spontaneous combustion in it.

3. ———— *Matters of Common Knowledge.*  In an action on a fire-insurance policy, where the sole question is whether spontaneous combustion occurred, it is not error to refuse to permit an expert chemist to define "fire," "ignition," "ignition point," the relation between "fire" and "flame," and kindred terms, of which the meaning is commonly understood by all well-informed persons.

4. PRACTICE, DISTRICT COURT—*Scientific Theories—Question for the Jury.*  Where scientific works of well-known authority and the opinions of experts are widely at variance upon the question whether spontaneous combustion is possible in a certain substance, courts will not assume, as a matter of law and fact, which theory is true, but will leave its determination to the jury.

5. ———— *Judicial Notice.*  Courts will take judicial notice of the meaning of English words, and of such matters of general knowledge, science or natural history as are, or may be, known by men of ordinary understanding and intelligence. "Judicial notice takes the place of proof, and is of equal force."

6. ———— *Instructions.*  In the case at bar it was not error to refuse to give an instruction that "wool cannot set fire to itself," nor to define "fire," nor to instruct that "no degree of heat short of ignition producing an actual burning is covered by the policy," where the court of its own motion charged

the jury that the definition of the word "fire" was unnecessary, and that "it would make no difference, if there was fire, whether it was in the form of flame or merely smoldering, but there must be in fact the presence of fire."

7. ——— *Demurrer to Evidence—Direction of Verdict.* Evidence examined, and *held,* that there was no error in overruling the demurrer to plaintiff's evidence, or in refusing at the close of all the testimony to instruct the jury to return a verdict for defendant.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed October 7, 1905. Affirmed.

## STATEMENT.

THIS was an action upon an ordinary fire-insurance policy to recover for loss and damage to a large quantity of wool which, it was alleged, was caused by fire. The Western Woolen-mill Company had about 30,000 pounds of wool stored in a warehouse in Topeka adjacent to its mill, where it was engaged in the manufacture of woolen cloth. The wool was what is known as "wool in the grease," as it comes from the animal and in its natural state, more or less contaminated with dirt. The insurance company insured the wool "against all direct loss or damage by fire."

On May 29, 1903, the great Kaw river flood, unprecedented in the annals of the state, was at its height. The flood-waters inundated the warehouse and its contents, and this wool was covered with water to the depth of several feet from May 29 to about June 5. It was about three days after the water subsided before the owners were able to obtain access to the wool. It was then found that the wool had floated about on the floor of the warehouse, and had been leveled from the original piles where it was stored and lay in a mass. It was claimed by the owners that spontaneous combustion had taken place in the wool by the action of the water and the length of time it remained in this condition. No fire occurred in or about the building, and it was not claimed that there was any fire except that

alleged to have been caused by spontaneous combustion.

The insurance company contends that the damage to the wool was occasioned by its being inundated by the flood, and after the water subsided it became heated; that the damage was caused by reason of the water and heat, without fire, which caused decomposition and injured the fiber of the wool; that as a physical and scientific fact spontaneous combustion cannot take place in wool, or "wool in the grease," as wool is an animal substance; and that spontaneous combustion can only occur in vegetable substances. It was not claimed that the wool itself was entirely destroyed, and it does not appear what quantity of it in weight or bulk was destroyed, but it was claimed that all that remained was so affected by the fire that its fiber was damaged and rotted; that its weight was much less than before the fire; and that it was of slight value. Afterward it was mixed with other wool and manufactured into shoddy cloth. Plaintiff claimed, however, in effect a total loss.

*Greene, Breckenridge & Kinsler,* and *Quinton & Quinton,* for plaintiff in error.

*Rossington, Smith & West,* and *Clifford Histed,* for defendant in error.

The opinion of the court was delivered by

PORTER, J.: The whole question in the case was whether the damage was caused by the action of fire. The answer specially denied that the damage was caused by fire, and averred that it was caused by water. The issue was raised squarely. The jury found for the plaintiff, and found the amount of plaintiff's damage to be $1030. In answer to the only special question submitted, which was by the insurance company, they found that the fire originated by spontaneous combustion. A motion to set aside this finding as not supported by the evidence was denied, as was the motion for a new trial, and the case is here for

review.   There are twenty-nine assignments of error, but only the ones that seem to require special attention will be noticed, and these in their order.   The first twenty-one assignments relate to errors in the introduction of testimony.

The first error complained of is in permitting a witness for plaintiff to testify that there was a fire.   J. F. McAfee, the principal witness for plaintiff, and manager of the woolen-mill company, was asked the following question:

"Ques. Now, state whether or not you had a fire in that wool in 1903, and when. [Objected to as calling for incompetent, irrelevant and immaterial testimony, and calling for the conclusion of the witness.] Ans. Why, there was; and it was between the 29th day of May and the 15th of June.   [Defendant moved to strike out the answer for the same reasons stated in the objection.   The motion was denied, and defendant excepted.]"

To permit a witness to testify to the ultimate fact to be determined by the jury is error. (*Solomon Rld. Co. v. Jones*, 34 Kan. 443, 8 Pac. 730; *Simpson v. Smith & Barnes*, 27 Kan. 565.)  It appears, however, that the witness McAfee, upon further examination, testified in detail to what he saw and all the facts and circumstances connected with the wool, and we are inclined to think that in this case the error was not prejudicial. (*Solomon Rld. Co. v. Jones*, 34 Kan. 443.   See, also, *Sparks v. Bank*, 68 Kan. 148, 74 Pac. 619.)

The next error assigned is that the court permitted the same witness to testify that when the door of the warehouse was opened smoke came out.   The objection was that this was incompetent, irrelevant, and immaterial, and called for the conclusion of the witness.   There is no error here.   Smoke is generally associated with fire, and is one of the most common evidences of fire. The question was whether there was fire in the wool; and while it was incompetent for the witness to testify to the conclusion that there was fire, as in the previous

question, it certainly was competent for him to tell what things he saw that were evidences of fire.

The third error complained of is that the same witness was permitted to testify that he had known of wool in a similar condition setting floors on fire. It is claimed by defendant that spontaneous combustion never occurs in wool; that wool is an animal substance, and that only vegetable substances are capable of spontaneous combustion. The witness had testified previously that he had been in the wool business for forty-four years. This made him competent to testify as an expert. (Laws. Ex. & Opin. Ev., 2d ed., 193.) In *Whitney and others v. The Chicago and Northwestern Railway Company,* 27 Wis. 327, the court held that wool merchants and manufacturers of many years' experience were properly allowed to testify as to "wool waste" and its liability to spontaneous combustion, and that in a certain sense men with such experience are experts. The subject-matter of inquiry here was not one lying within the common experience of all men, so as to make it objectionable as a subject for expert testimony.

"The opinions of experts are limited to matters of science, art or skill, yet this limitation is not applied in any rigid or narrow sense. And every business or employment which has a particular class devoted to its pursuit is said to be an art or trade, within the meaning of the rule." (Rog. Exp. Test., 2d ed., 25.)

The next error assigned is in overruling the defendant's demurrer to plaintiff's evidence. It is sufficient to refer here to some of the numerous rulings of this court to the effect that where, as in this case, there is some evidence to warrant the submission of the case to the jury the demurrer should be overruled. (*Merket v. Smith,* 33 Kan. 66, 5 Pac. 394; *K. C. Ft. S. & G. Rld. Co. v. Cravens,* 43 Kan. 650, 23 Pac. 1044; *Rogers v. Hodgson,* 46 Kan. 276, 26 Pac. 732.)

The next five errors complained of, including the ninth, can be disposed of together. Defendant offered

to prove by the deposition of an expert witness, W. T. McClement, who qualified as an expert chemist, what is "fire," "ignition," and its physical characteristics; what is meant by the "ignition point"; that in his testimony he used the word "burn" in its ordinary significance; the meaning in chemistry of the term "slow combustion"; the relation between "fire" and "flame"; and some other scientific terms in explanation of the above. While much of this evidence might have been interesting, it would throw little, if any, light upon the one question at issue—whether in fact there was a fire in the wool as claimed, and there was no error in refusing to admit the testimony. Most of it related to the characteristics of fire, a subject within the common knowledge and experience of the jury, and for that reason it did not come within the rule as to expert testimony. (See authorities cited *supra.*)

The tenth error assigned has more merit. The same witness was not permitted to testify that the natural grease in wool is not identical with the fat of the animal, and that it is an exudation from the skin analogous to the oil in the human scalp. Defendant was endeavoring to prove that wool will not support spontaneous combustion; and, unless it is clear that the nature of grease in wool is a subject of which the jury might be said to know from common knowledge and experience, and of which courts take judicial notice, it would have been proper for defendant to prove it by expert testimony for the purpose of showing that "wool in the grease" is different from greasy wool, and that the natural grease in wool is not a thing which might add to or increase the combustibility of the wool in question. But, generally speaking, the nature of wool is well and commonly known, and for that reason it was not prejudicial error at least to exclude the scientific description of its characteristics.

The next error we shall notice is set out as follows:

"The court erred in refusing, upon its own motion,

and without objection from the plaintiff, to permit the defendant to read to the jury, as original evidence, certain portions of the cross-examination and recross-examination of the witness W. T. McClement, the reading of which was waived as cross-examination by the plaintiff, which said recross-examination embodies the testimony of the witness that the results of spontaneous combustion and decomposition are similar; that fire involves the production of light or flame or luminosity; that wool does not give off a gas which can burn invisibly; and that a sufficient amount of heat could be produced without fire to destroy wool fiber."

Without deciding whether the action of the court was error, it is sufficient to say that defendant was not prejudiced by the exclusion of this testimony. The court will take judicial notice of all things sought to be proved here. "Judicial notice takes the place of proof, and is of equal force." (*State v. Main,* 69 Conn. 123, 136, 37 Atl. 80, 36 L. R. A. 623, 61 Am. St. Rep. 30.) In *Poor v. Watson,* 92 Mo. App. 89, it was said:

"Judicial notice should be taken of things which are of general knowledge among people of ordinary information. They will take judicial notice of recognized scientific facts and principles without the necessity of evidence and may do so of their own motion."

(See, also, *LaRue v. Insurance Co.,* 68 Kan. 539, 75 Pac. 494.)

What has been said in reference to the testimony offered in the deposition of the witness McClement applies also to the errors complained of as to the exclusion of parts of the deposition of the expert chemist, Edward Gudeman. And there was no error in permitting Professor Bailey and Professor Dains, in rebuttal, to testify that in their opinions spontaneous combustion can occur in a mass of wool by the application of water. Defendant offered expert opinions to show that spontaneous combustion cannot occur in wool, and this clearly was rebuttal.

An examination of the numerous other errors complained of in reference to testimony discloses nothing else worthy of special mention.

The next error relied upon is the refusal of the court to instruct the jury to return a verdict for the defendant. As was said in reference to the overruling of the demurrer to the evidence, there was some testimony to go to the jury, and if there was any, of course, under the oft-repeated rule, this court cannot reverse the judgment of the lower court, nor will it weigh the testimony of the parties to determine the preponderance. (*Cornell University v. Parkinson,* 59 Kan. 365, 379, 53 Pac. 138; *K. P. Rly. Co. v. Kunkel,* 17 Kan. 145; *Cheney v. Hovey,* 56 Kan. 637, 44 Pac. 605; *Ketner v. Rizer,* 34 Kan. 603, 9 Pac. 208; *Railroad Co. v. Matthews,* 58 Kan. 447, 49 Pac. 602.)

That there was some evidence to support the verdict we cite the following facts disclosed by the record: The witness McAfee testified that the heat was so great when the doors were burst open that no one could go inside for several hours; that he saw smoke come out of the door when it was opened; that the wool was "charred," and showed a charcoal on part of the wool, which was decomposed. He testified that the fiber of the wool was damaged; that the wool itself was so hot it could not be handled by hand; that he was obliged to send for pitchforks, so that the men could turn the wool and scatter it about; that he put his hand in the mass of wool and the heat was so great he could not leave it there; that the woolen twine with which the fleeces were tied was "burned," and broke when the men handled the bundles; that he smelled the odor of burnt wool. He testified that the wool remaining was so damaged by the heat that it was practically of little value; that wool will not burn with a flame except when a flame is held against it; and that the instant the flame is removed it will go out. E. H. S. Bailey, professor of chemistry at the state university, testified that in his opinion spontaneous combustion can occur in unwashed wool by the application of water. After an examination of a sample of wool taken from that in controversy, he testified that in his

opinion its condition could have been caused by fire. F. B. Dains, professor of chemistry in Washburn College, testified substantially the same.

Error is alleged also because the court refused the following instruction: "You are instructed that wool cannot set fire to itself." The court has been favored in the briefs with the results of much scientific and literary research by counsel on both sides in support of their respective theories as to the possibility of spontaneous combustion of "wool in the grease" when subjected to water, and history, ancient and modern, on the subject and nature of fire, supplemented by text-books on organic chemistry and references to all standard authorities upon definitions. To quote from one brief:

"Fire and human culture date together. It was a factor in the religious observances of the ancient Egyptians, Greeks, Latins, and Persians, and on the American continent among the Natchez, Mexicans, and Peruvians. All of this evidences man's familiarity with fire, and the fact that its phenomena are nothing new to the human race."

Like many other questions of this character, there appears to be great diversity of scientific opinion as to whether spontaneous combustion can occur in wool, or in "wool in the grease." From all the authorities we have examined it can be said, at least, that the probability of spontaneous combustion in wool is very slight. The books of scientific character being so much at variance, it cannot be said that the one view or the other must be taken by the courts; and, as the instruction asked went to the whole merits of the controversy, it was not error to refuse it. Defendant offered the following instruction:

"The policy in suit is a contract of indemnity against loss or damage directly caused by fire. The word 'fire' is used in the policy in its ordinary and usual meaning, and means visible heat or light. No degree of heat short of ignition producing an actual burning is cov-

ered by the policy, and damage to the wool caused by heat that did not reach an actual burning is not covered by the policy."

This was refused, and the court of its own motion gave the following:

"The word 'fire' is so common and so well understood that I deem it unnecessary to give you any definition of what constitutes fire. It would make no difference, if there was fire, whether it was in the form of flame or merely smoldering; but there must be in fact the presence of fire."

Error is alleged in refusing the first and in giving the second, and we shall consider the instructions together. The objection to the first is that it attempts to define "fire," which, as the court below said in the instruction given, is "so common and so well understood" as to require no definition. Besides, the giving of the other instruction, in which the jury were expressly told that "there must be in fact the presence of fire," was sufficient.

The other errors alleged, such as denying the motion for a new trial, etc., are disposed of in what has been said.

Plaintiff in error argues that as a matter of law no degree of heat short of ignition or actual fire will permit a recovery in this case, and insists that as a matter of fact, disclosed by all the evidence, there was no fire in plaintiff's wool to cause the damage it sustained, but that the damage was caused by the process of decomposition, decay, or rotting, and that the judgment upon the verdict is unjust and should be reversed. It is true there must be fire causing the damage to plaintiff's wool before plaintiff would be entitled to recover, but in our view there was some evidence to warrant the finding of the jury; and the court, while refusing to instruct that no degree of heat short of ignition would permit of a recovery under the policy, did instruct that if the damage to the wool was occasioned by its being heated without fire plaintiff could not re-

cover, and that if, on the other hand, spontaneous combustion took place, producing or resulting in fire, and the damage to the wool was caused in that manner, then plaintiff would be entitled to recover. The trial court took the view that fire is such a common thing as to require no definition, and in this we think he was right. The instructions presented the one issue fairly, and, there being some evidence to support the contention of plaintiff, it follows that, while the verdict might not be ours if we were trying the issue of fact upon the same evidence, we cannot, upon consideration of the weight and preponderance of the testimony, disturb the verdict and judgment.

The judgment is affirmed.

JOHNSTON, C. J., GREENE, BURCH, MASON, GRAVES, JJ., concurring.

PORTER, J. (dissenting) : The writer is unable to concur in the views of the majority of the court as expressed in the foregoing opinion. This court has reversed a case where the ownership of two steers worth sixty-three dollars was involved because of error in permitting a witness to testify directly to the ownership, that being the ultimate fact to be determined by the jury. (*Hite v. Stimmell,* 45 Kan. 469, 25 Pac. 852.) In that case some other incompetent testimony was admitted, which was, however, of little consequence; and, it is only fair to state, it does not appear in that case that the witness testified further to the facts and circumstances upon which his conclusion was based.

In the present case the principal fact to be proved was that there was a fire. If there was, plaintiff was entitled to recover. If not, it could not recover. Over the objection of defendant McAfee was permitted to testify that a fire occurred there in the wool. The theory of the majority opinion seems to be that by giving in detail in his further examination the facts and circumstances upon which his conclusion was based the error was cured. In some cases, doubtless, the

error of such testimony is thus rendered immaterial; but one conclusion cannot be bolstered up by several other conclusions and opinions. Testifying further, this same witness, asked to describe the condition in which he found the wool, said: "The wool was damaged by heat and fire to a great extent." The court denied a motion to strike out this answer as a conclusion of the witness, to which defendant saved exceptions; but in the assignment of errors the point is overlooked. In another answer he repeated the same in substance. Again, he said that some of the strings around the fleeces were "burned" so that they broke in handling. It was woolen twine, and this was a mere conclusion. Again, on recross-examination, on being asked if there was a fire in this building he said:

"Yes, sir, there was fire in the building.

"Ques. Where? Ans. In this wool.

"Q. Whatever was done to this wool was done by water? A. It was inundated by water, and there being a large amount of wool together, it got afire."

Further, on recross-examination, without being asked, he said spontaneous combustion had taken place. If upon examination of all his testimony it could be said that he detailed any circumstance or fact which to an unprejudiced mind showed the presence of any fire in the wool, it might be that the error of permitting this testimony was rendered immaterial; but a careful review of his testimony shows that the incompetent statement objected to was not explained by such facts but merely reenforced by repeated statements of conclusions fully as incompetent. What effect these statements may have had upon the jury is not known; but, from their finding that there was a fire upon what appears to the writer no evidence whatever, it is probable that these statements were accepted as some evidence.

The court in an ordinary case well might refuse to define "fire," because the word is so common and well understood; but this was no ordinary fire. It was, if

any existed, a most extraordinary one; and, even if plaintiff's theory is true, that spontaneous combustion took place, it was not the kind of fire with which everybody is supposed to be familiar. Moreover, the court, while refusing to define the word "fire," did use the qualifying adjective "smoldering" when there was no evidence to warrant it. The language of the instruction is:

"It would make no difference, if there was fire, whether it was in the form of flame or merely smoldering, but there must be in fact the presence of fire."

The defendant did not rest its defense on the absence of flame but on the absence of "luminosity." There was an entire lack of any testimony of luminosity, which term includes either flame or a kindled heat without flame. Every definition of fire found in the text-books and dictionaries includes both heat and light—not necessarily flame, but luminosity. Webster's Unabridged Dictionary defines "fire" as "the evolution of light and heat in the combustion of bodies; combustion, state of ignition." "Smoldering" the same authority gives as "being in a state of suppressed activity; quiet but not dead." There was no evidence of any smoldering fire in this wool. No man ever knew of a smoldering fire which, if he digged into it far enough, would fail to disclose the presence of visible heat or light. Every one has seen a pile of smoldering weeds. Often there is no evidence of fire until it is reached by digging into the mass; but, if it is in a smoldering state, the visible fire, with or without flame, can be found easily. If it cannot be found it is because it is not there. So these men with the pitchforks, turning this wool for nine days and nights in heroic efforts to save it from burning, as the witness McAfee testified, must have discovered it or it was not to be found, except in his conclusions.

Following Webster as authority, and in view of the extraordinary kind of fire alleged to have occurred in this wool, the court should have defined "fire" as used

in the policy as meaning visible heat or light, and said nothing about a smoldering fire. This belief is strengthened by the testimony of McAfee, who said that in the word "fire" as used by him he did not understand that one of the elements necessary is visible heat or light, and by the further fact that it was not contended by plaintiff that the fire was smoldering.

For the same reasons the court should have instructed the jury that "no degree of heat short of ignition producing an actual burning is covered by the policy." In *Gibbons v. German Ins. & Savings Inst.*, 30 Ill. App. 263, 265, Justice Gary, with over thirty years' experience upon the bench, speaking for the court, said:

"Fire and heat are not one, but cause and effect; and damage by heat is not insured against in terms, and is covered by the policy only where the misplaced fire causes it. . . . The common understanding of the word fire would never include heat, short of the degree of ignition."

(See, also, Kerr, Ins. 374; Clem. Fire Ins. as a Valid Con. 87; *Austin v. Drew*, 4 Camp. 360; 6 Taunt. 436.)

The court, in attempting to define the issues, instructed the jury as follows:

"The plaintiff claims that the wool covered by the policy in suit was inundated by the flood, and after the water subsided spontaneous combustion occurred, and that the wool was damaged by such spontaneous combustion."

This stated properly the only issue of plaintiff. The court then said:

"The defendant company contends that there can be no spontaneous combustion in a body or mass of wool, and that fire could not be produced in that way, and testimony has been offered bearing upon that question."

A deal of testimony, in fact, was offered upon this question; but it was a contention not at all essential

to defendant's claim, nor a material issue as shown by the pleadings and evidence. Defendant had a right to contend that spontaneous combustion in wool is an impossibility, but was not bound by a failure to establish this theory. The jury might have credited the testimony of the Kansas chemists as against those from Chicago, and, finding against defendant upon this theory, have been misled by this instruction, when the real defense was that no fire existed. The other instructions may possibly have rendered the foregoing immaterial. Where, however, the trial court attempts to define the issues, care should be observed not to marshal against a material issue on one side an immaterial and non-essential contention on the other.

The question whether there was any evidence of the existence of fire which caused the damage to the wool rests in this case upon the final analysis of the evidence of McAfee, for no other witness on either side testified about any fire. It is singular that if a fire occurred under such peculiar circumstances, destroying over $5000 worth of wool, no other witness was produced to testify to the facts showing the existence of a fire, when that was the sole question at issue. There were several others present all the time that McAfee was there—Holman, president of the woolen-mill company, his brother, and the employees (the five men with the pitchforks). All these, or some of them, must have known all that McAfee knew about the fire, and have seen all that he saw. Yet none is sworn to testify to the circumstances which it is claimed were evidences of the fire. In construing his testimony, all that he swore to must be considered except his statements of mere conclusions. It is only the legal evidence, and such favorable inferences as might be drawn therefrom, that can be considered. Eliminating his conclusions as incompetent, we have his own statement on cross-examination that there was no fire in the building; that the floors and other woodwork showed no sign or evidence of having been

heated or burned. He testified several times that he did not see any fire in the wool, nor in the building. When Mr. Blakely came and examined the wool, Mc-Afee said, according to his own testimony:

" 'Mr. Blakely, we cannot save this wool. We have a policy written by you covering this insurance on this wool, and I turn it over to you. You can do with it what you please.' Mr. Blakely says, 'I have no way to take care of it. You hire all the men you can and put in here and save this wool if possible.' . . . In pursuance of his direction, I kept on and done my best to save the wool. I hired all the men I thought we could use and put them in there and watched them closely, except at night, when they were working by themselves. . . . I called four or five men. . . . I engaged them to go into this wool and work all night to keep it from burning up. We then undertook to handle it with our hands and could n't do it."

He further testified that they then sent for pitch-forks and kept turning the wool over for eight or nine days and nights; that they had "a double set of men to work with this wool to keep it from all burning and also burning the building;" that "of course, the wool was wet;" that "we put a stove in the warehouse to dry the wool. We kept the stove in there and the heat from this stove probably three weeks." Describing the condition of the wool, he testified:

"Take a fleece of wool that would weigh five or six pounds, . . . and if that fleece was dried out it would probably weigh less than before the fire or flood."

From this it appears that he claimed in fact a damage by heating which he construed as the same thing as fire because the fiber was destroyed and the wool "rotten."

This court must take judicial notice of the effect on wool of its remaining for a considerable time under water, because the effect is within the range of common knowledge, and, besides, not only do text-books and works on chemistry state the effect, but we have

the opinion in the record of six experts, all agreeing—McClement, Stiles, Bach, Gudeman, Dreyfus, and Lovewell.  Emanuel Bach, a wool merchant of thirty years' experience, testified that wool left for a time in the wet ferments and rots and the fiber is injured and destroyed, and that the identical effect shown in this wool takes place.  Jacob Dreyfus, with thirty years' experience as a wool merchant, and Lawrence G. Stiles, with twenty years' experience, testified to the same effect.  The latter had seen many millions of pounds of wool affected in the same way by the action of water without heat sufficient to produce fire.

The facts disclosed by the testimony seem to justify the conclusion that the spontaneous-combustion theory was an afterthought.  Blakely, the insurance agent, was informed by Holman on the street that they had suffered a loss to wool by water, and went over probably the day after the warehouse was opened.  No claim of ignition was made to him, or of anything but damage by heat caused by water.  Blakely expressed regret personally that nothing showed any evidence of fire, as the term is usually employed.  Milton Welsh and another adjuster, with Blakely, several days later examined the wool in the presence of Holman and McAfee.  Mr. Welsh testified that no claim was made at that time of ignition or fire, but the talk was that the wool had been injured by heat caused by water; that the wool even then was wet, warm, and steaming, though it had been scattered out for several days. Two letters were written him by Holman afterward and referred to the loss as damage to wool by water.

But there were others who were present during the time so much effort was being made to prevent the fire from consuming all the wool.  Two employees of the company, both wool men of many years' experience, testified that they saw the wool while it was being turned and saw no trace whatever of fire, and upon examination found no "char" such as is left on wool

when a flame is held against it and then taken away. Neither detected any odor of burned wool.

This testimony is not referred to for the purpose of weighing the evidence but of demonstrating that, viewed in the light of facts which courts must know, the testimony of plaintiff has no weight, and does not even tend to show the existence of any fire.

We are asked to believe that there was "some evidence" that spontaneous combustion occurred in this wool while it was dripping wet, three days after it had been covered with eight or nine feet of water, where the evidence of plaintiff also shows that the heat was not sufficient to blister the hand when held in the wool. Boiling water would do that, and wool will not ignite until subjected to much greater heat, according to the testimony of experts and scientific books of authority. But the most incredible thing is that this mass of wool could have been on fire without the discovery by some one digging into it of "visible heat or light"—not necessarily a flame, but something luminous.

It will not do to say that this court is not concerned as to when the fire occurred, and that it might have been on fire and the fire gone out before the witnesses arrived on the scene, because McAfee's contention, as shown by his entire testimony, is that the evidences of fire which he claims to have seen showed that the fire was still in progress. The heat, the smell, the smoke, were there, and in order to keep the wool from "burning up" it was necessary to employ men to keep turning it over for nine days and nights. Then, in further effort to extinguish it, a fire was started in the stove and kept going for three weeks to dry the wool.

The words "spontaneous combustion" are always used with reference to the origin of fire. The Century Dictionary defines spontaneous combustion as "the ignition of a body by the internal development of heat without the action of an external agent." There was

not the slightest evidence of ignition in all the plaintiff's testimony, giving to it every favorable inference. If spontaneous or any other kind of combustion took place, it could only mean that the mass of wool "took fire," and we all know what would have been the result if the wool had taken fire. It would have been destroyed, and the building with it, unless extinguished; and, if reasonable men had discovered it to be on fire, instead of sending for men with pitchforks they would have sent for the fire department, in an effort to save the building at least.

No part of this dissent is based upon the theory that spontaneous combustion is impossible in wool. On the contrary, even if it be conceded that it is not only possible but highly probable, still there is an entire absence of any evidence that fire of any kind occurred. There was a heating of the wool, and injury thereby, but no ignition, no burning, no actual fire, as the word is commonly understood or within the meaning of the policy. It was essential to plaintiff's right of recovery to prove that actual fire occurred. Aside from statements of conclusions, the testimony of the only witness showed that in fact there was only a heating, and no actual fire.

Where the trial court has refused to take cognizance of matters within the judicial knowledge of the court the rule is stated as follows:

"It is clear that, upon a proper record, the appellate court should reverse a judgment where a principle or rule of law, judicially known to the court, requires it to do so, even though the trial court may not have taken judicial notice. . . . Even though it may not be authorized to weigh evidence and pass upon the facts, it may, and should, so use its judicial knowledge as to bring about justice. Thus, there are often undisputed physical facts clearly shown in evidence, and by applying to them a well-known law of nature, of mathematics, or the like, it is demonstrated beyond controversy that the verdict or finding is based upon what is untrue and cannot be true. In such cases it is very generally held that the appellate court

should take judicial notice of the law of nature or mathematics or quality of matter, or whatever it may be that rules the case, and apply it as the trial court should have done."    (1 Ell. Ev. § 39.)

Where all the evidence most favorable to plaintiff leads to a result so much at variance with what we know from general information and common sense, and puts such a strain upon the credulity of the court, the judgment should be reversed.

The writer dissents from paragraph 1 of the syllabus as applied to the facts in the present case, and to all of paragraph 6 except the first clause therein, and to paragraph 7.

He is authorized to say that Mr. Justice SMITH concurs in this dissent.