## UNITED STATES v. STEADMAN.
### No. 1008.

Circuit Court of Appeals, Tenth Circuit.
Oct. 30, 1934.

Rehearing Denied Nov. 30, 1934.

John S. Boyden, Asst. U. S. Atty., of Salt Lake City, Utah, and Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C. (Dan B. Shields, U. S. Atty., and Edgar C. Jensen, Asst. U. S. Atty., both of Salt Lake City, Utah, Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., and Randolph C. Shaw, Sp. Asst. to the Atty. Gen., on the brief), for the United States.

J. M. Lampert, of Boise, Idaho (B. W. Oppenheim and J. B. Musser, both of Boise, Idaho, on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Appellee enlisted in the military service March 2, 1918, saw service in France, was in hospital for flu a short time, was honorably discharged May 5, 1919, and returned to his father's home in Utah that month. He recovered judgment on a war risk insurance policy which expired on July 1, 1919, unless he was then totally and permanently disabled from following a gainful occupation. He alleged he was so disabled. Appellant denied it. The burden was on him to establish that claim. At the close of the evidence appellant moved for a directed verdict in its favor. The motion was denied and exception saved. The question here is whether there was substantial evidence to sustain the verdict in his favor.

A day or two after appellee returned home he tried to work on a ditch. In stooping over he got dizzy and felt faint. That happened more than once. He quit, and sent for Dr. Alley on May 29, 1919. Dr. Alley testified that appellee was under his care from that time for about a year suffering from "acute articular rheumatism with complications of endocarditis and nephritis;" that with articular rheumatism there is always some heart involvement; that appellee was bedfast for about six months and the balance of the time he was in the house sitting around, up and down, unable to work; that when he first examined appellee he had acute articular rheumatism which meant that it had come on suddenly; that he had remained in that condition since that time, but the severity had varied, there were intermissions; that he had treated appellee since from time to time, the home calls being rarer in number than the office calls; that he found decompensation of appellee's heart the first time he treated him.

Dr. Quick, who is Dr. Alley's professional partner, was called to see appellee in October, 1922, for the first time. He found him suffering from acute rheumatic fever and arthritis, also endocarditis, which is an inflammation of the lining of the heart necessitating restfulness, also swollen and reddened joints accompanied with pain in his hands, ankles and wrists. He had treated appellee at times since then. He had an attack of flu and appendicitis. Appellee's condition is now more serious than it was in 1922. He treated him in July, 1923. He treated him as late as the winter of 1932. In 1923 was the only time he showed any decompensation of the heart. All other times the heart was compensating. He said that with a compensating heart there was nothing that would prevent a man from following a gainful occupation providing his condition did not flare up; with his particular type of heart a person does not get along well when he overdoes any. "Mr. Steadman possibly could do some light work, but if he were exposed in bad weather and chilled through it would cause his heart to increase beating and cause his rheumatism to return. Overeating, fatigue, lack of sleep or worry are contributory to bringing on an attack."

Physical examinations made by other physicians and surgeons disclose these facts: Appellee stated in writing when he was examined for enlistment that he had rheumatic fever about seven years before that date. At time of discharge he stated in writing that he had no reason to believe that he was then suffering from the effects of any disease, nor had any disability or impairment of health, and it was certified by a member of the medical corps at that time he had been given a careful physical examination and he was found to be physically and mentally sound and to no per cent disabled.

Dr. Critchlow examined appellee at Salt Lake City June 15, 1931. He reported that appellee complained of rheumatic pains in joints, occasional pains in region of heart and nervous and dizzy spells. He found that spine and joints were then movable without pain; that there was no swelling, and his diagnosis was: Valvular heart disease, chronic, mitral stenosis, and insufficiency, rheumatic, compensated. Dr. Paul made the same report as of that date relative to appellee's heart. Dr. Ossman, an orthopedic medical examiner, examined him January 18, 1923, and reported: Mild stiffness and tenderness with manipulation of wrists, elbows, shoulders, knees and hips. Mild crepitation elbows, shoulders and knees. No joints swelling, nor local heat at present. His diagnosis was: Arthritis, chronic, rheumatic, multiple. Dr. Ossman examined him again in June, 1929, and reported that physical examination showed no objective findings of rheumatism. All joints freely movable. No swelling or local heat, and there was no complaint except soreness in hands and fingers. Dr. Ossman examined him again May 22, 1930, and found there were no limitations of motions. Fingers, wrists, elbows and shoulders appeared normal. Back motions complete without pain. Hips, ankles, feet and toes apparently normal with no loss of motions. Knees also appeared normal but complained of painful motions, which, however, are not limited. Diagnosis: Arthritis, chronic, multiple, rheumatic. In the summer of 1930 appellee went to the Veterans' Hospital at Boise, Idaho, and was there examined by a board composed of three members. The diagnosis there as to his heart and rheumatic condition was substantially as at other examinations that have been stated and of the two physicians who testified for him.

There can be no doubt that appellee's attempts to do manual labor immediately after his return home in May, 1919, was followed by serious illness, rheumatism and heart involvement, for quite a while. There is but little in the record as to his activities until March, 1921. He testified that he was under Dr. Alley's care for eighteen months after May 29, 1919. He had pain at times in his joints and about his heart, and that continued up to the winter of 1920-21. But he recovered and was active in many ways. The months and years subsequent to March, 1921, and what he thereafter did must have attention.

In March, 1921, appellee and his younger brother drove his father's sheep to the range

about Soda Springs, Idaho, and stayed with them there until September or October of that year. He was in charge. He rode horseback part of the time. Sometimes he would get dizzy. During the winter of 1921-22 he lived with his father. There were times when he couldn't milk the cows on account of swelling in his fingers. He helped some with the chores. In March, 1922, he again helped take his father's sheep to the range for the summer. He was in bed ten days at Soda Springs and called a doctor. When he was on the range in 1921 he met his future wife at Star Valley, Wyoming. They went out together during that summer, and she observed nothing unusual in his physical condition. In 1922 while on the range he went to see her in July. He got supplies there for the sheep. When he came there in 1922 he was sick, looked pale, and the two went together to his father's home in Utah, where they were married August 16, 1922. Within a week thereafter he and his wife went to a small place owned by his uncle, and they stayed there until February, 1923. He did some farm work there and received wages. In February, 1923, he rented an 80-acre farm from his father, remained there until December, 1926, operating that farm for four seasons. His father got half of the hay and two-thirds of the grain as rental. He paid a hired man $75 a month. It was an irrigated farm. Appellee helped to irrigate and to put in the crops. He did some plowing, harrowing and planting when he was able. He milked when he was able. He did chores. If he got his feet wet irrigating he would be down two or three days. He couldn't pitch hay throughout the day. He tried to, but would get exhausted. He got sick the summer of 1923, and an organization of his church came in and harvested his crop. Again in 1924, 5 and 6 he tried to irrigate and to do various things on the farm. He would get dizzy cleaning the ditch. At times he couldn't milk on account of his joints being stiff. On different occasions he had the doctor and was taking medicine.

In December, 1926, appellee moved to the Stillman ranch, 160 acres, and remained there until September, 1929. While there he was hired to run that ranch on a salary of $90 a month, and he received that salary for thirty-three months. He did some irrigating on that ranch, but at times would lie down on account of his heart. About 1,500 of Stillman's sheep were there in his charge. It was his job to see that the place was irrigated, the crops harvested and the sheep cared for. He had authority to hire extra

men during the busy season. He was in complete charge. Occasionally he ran a mower. He did some plowing. His wife testified that heavy physical labor affected him; that she had put on overalls and helped him pitch hay because he couldn't stand it. At times he drove a team, but it was his business on that ranch to boss the job, to act as an overseer.

His father testified that he rented the 80-acre ranch to appellee because it was too big a job for him to operate it; that he had other business to look after. Later his father sold him about 200 sheep at $10 or $11 a head, and appellee paid him for them.

■ When appellee left the Stillman ranch in September, 1929, he rented a forty-acre farm of his father on a crop basis and remained there until March, 1932. At different times through all of these years he would call a doctor. He was laid up from time to time. He spoke of the swelling in his joints as inflammatory rheumatism, but much of the time there was no swelling, and he was out doing various things, at times all kinds of farm labor. He did things that brought on attacks of inflammatory rheumatism and overtaxed his heart. Neither expressly nor impliedly is self-inflicted disability covered by the contract sued on, and negligent disregard of one's conduct with knowledge that it may be harmful to him puts him in no better position.

■ This suit was not instituted until twelve years and seven months after plaintiff's discharge on which day he alleges he was totally and permanently disabled. See Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492. His long delay strongly opposes his present contention.

■ In passing on the court's action in overruling appellant's motion we put aside and give no weight to the testimony of Drs. Alley and Quick that, in the opinion of each, appellee was totally and permanently disabled. That was the issue under the pleadings for determination by the jury and not for any witness to pass upon or inform the jury how it should pass upon it. Miller v. United States (C. C. A.) 71 F.(2d) 361, 364.

In every triable case there are one or more—sometimes many—controverted facts, the truth of which as to each is for the jury, and having considered and solved them to its satisfaction under its oath of office, in accord with principles of law given to it by the court, it deduces therefrom its ultimate conclusion on the issues joined. Here the two doctors informed the jury under oath that its ultimate conclusion should be for the plaintiff. This is characterized in the books as an intrusion of the witness into the jury box, as an assumption and usurpation of the jury's functions and duties. There was a field for expert testimony in the case, and there is no doubt that Doctors Alley and Quick were qualified and competent. They attended the plaintiff when he was ill and saw him on many other occasions about his health. Apparently they could have fully and in detail described his illness, his physical condition brought on by his illness, what result would likely attend labor and efforts of various kinds, whether he should or should not attempt to carry on different occupations, and the effect upon him physically or mentally from so doing. That sort of testimony would have been an appropriate, permissible and helpful aid to the jury, and with the other facts and circumstances it could have drawn its conclusion whether plaintiff was, as he alleged, "totally and permanently disabled." Obviously that course of examination was far from having a witness with prestige of professional learning tell the jury in substance what its verdict should be. The point is sharply marked in Sun Ins. Office of London v. Western Woolen-Mill Co., 72 Kan. 41, 82 P. 513. There the plaintiff sued its insurer for loss of a large quantity of wool by "fire." The answer denied damage by fire and averred that the damage was caused by flood water. At the trial an expert witness for plaintiff testified that when the warehouse door was opened smoke came out. He also testified that there was "fire" in the wool between May 29th and June 15th. Both questions and answers were objected to. The court held that the first was competent inasmuch as smoke is generally associated with fire and is one of the evidences of fire. As to the other question and answer the court held that it was incompetent and should have been stricken and said: "To permit a witness to testify to the ultimate fact to be determined by the jury was error." That, it will be observed, was the ultimate issue in the case, whether the wool was damaged by fire. Best on Evidence (Morgan's Ed.) § 513, and 1 Greenleaf on Evidence (15th Ed.) § 440, state the rule in the same terms: "But where scientific men are called as witnesses they can not give their opinions as to the general merits of the cause, but only their opinions on the facts proved." 3 Chamberlayne on Modern Law of Evidence, § 1899, has this on the subject: "Should the question be so drawn as to involve an inference on the precise point on

which the jury are to pass * * * it will, in general, be objectionable and so rejected." Jones Commentaries on the Law of Evidence in Civil Cases (2d Ed.) vol. 3, § 1321:

"Since expert testimony is an exception to the general rule of law excluding opinions from evidence, and trenches upon the province of the jury, it is not to be extended beyond the necessities of the case. The determination of the matters directly in issue is not thereby to be taken from the jury. Hence, the ordinary rule is that opinions of experts upon the merits, or upon the very matter to be tried, are inadmissible. * * * Whatever liberality may be allowed in calling for the opinions of experts, such witnesses must not be permitted to usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends. Although this view has been earnestly criticized, it is sustained by the undoubted weight of authority. It is, moreover, founded in practical necessity as well as theory; for in many cases trials would become farcical if zealous experts were allowed to express direct opinions upon the very issue to be tried."

We are aware that Mr. Wigmore in his treatise on Evidence seems much opposed. In Donnelly v. St. Paul City Ry. Co., 70 Minn. 278, 73 N. W. 157, the plaintiff sued for injuries received resulting from derailment of a street car on which she was a passenger. There was no dispute as to the defendant's negligence. The principal contention was that the plaintiff did not suffer the injuries as a result of the derailment and at the time thereof, but that they were traceable to other causes. The defendant called a medical expert and asked for his opinion as to the cause of plaintiff's condition based upon the evidence as to the manner in which she was injured. The court discussed the point under consideration here, said that it was at times difficult to draw the line between what was and what was not proper expert testimony and said: "It is laid down in the books that a question to an expert witness should not be so framed as to invade the province of the jury. * * *" In Poole v. Dean, 152 Mass. 589, 26 N. E. 406, 407, the point under consideration was the mental condition and capacity of one to execute a deed. An expert witness expressed his opinion on that issue using as a standard "the usual and ordinary capacity for doing business." Responding to objections to the question and answer the court said:

"The inquiry did not involve any question of law for the consideration of the witness, nor did it require him directly to express an opinion as to the capacity of Moore to do the specific act in controversy, and thus to put himself in the place of the jury. Any expression of opinion which will aid a jury in such a case necessarily involves the consideration of questions which are similar to that in issue, and sometimes of those which include it. But that alone does not render the evidence incompetent if the witness is not permitted to express opinions upon evidence, and if the questions are so framed as to confine him to a statement of his conclusions as an expert, and not to submit to him the precise issue which is presented to the jury."

In Re Cheney's Estate, 78 Neb. 274, 110 N. W. 731, the question was whether a testator had mental capacity to make a will. Over objection several witnesses were permitted to answer that the testator had such capacity. The court said:

"The question required the witnesses to usurp the functions of both court and jury, because it required them to determine the degree of mental capacity required to make a will, which is a question of law, and whether the testator, when the will was made, was possessed of such capacity, which was the principal issue for the jury to determine. As has been said: 'Whatever liberality may be allowed in calling for the opinions of experts or other witnesses, they must not usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends.'"

In McGibbons v. McGibbons, 119 Iowa, 140, 93 N. W. 55, the issue again was whether a person was of unsound mind. The trial court sustained an objection to this question asked of a physician: "State whether or not, in your judgment, she possesses sufficient ability to understand in a reasonable manner the nature and effect of her acts in business transactions?" The proceeding was for the appointment of a guardian because of unsound mind. The court said this of the question objected to:

"We think an answer to the question was properly excluded. The witness had been allowed to express his opinion as to the mental soundness of the defendant, and this was proper. But the ultimate question as to the extent of her capacity to reasonably understand and transact business matters was clearly within the exclusive province of the jury."

Baker v. Baker, 202 Ill. 595, 67 N. E. 410, 418, was a suit contesting a will. Several witnesses testified that they did not regard the deceased as capable of transacting ordinary business, and they were then asked these questions, which they were not permitted to answer: "'Whether or not the testator, at the time of making the alleged will, had sufficient mind and memory to understand the will in question'; 'whether or not he was able to carry in his mind and memory the nature and extent of his property'; and 'whether or not he was able to understandingly execute a will.'" The court said: "These questions simply called for the conclusions of the witnesses as to testamentary capacity. In other words, the attempt was to put the witnesses in the place of the jury, and allow them to determine the very issue which it was sworn to try. The evidence was clearly improper." Pyle v. Pyle, 158 Ill. 289, 41 N. E. 999, 1002, was a will contest. The court said:

"We think that some of the questions put to Dr. Kell, Dr. Campbell, and Dr. Keeley, and permitted to be answered by them over the objections of appellants, were improper. It is not the proper practice to ask of a witness called as an expert a question which does not embody a hypothetical statement of the facts, but which directly calls upon the witness to put himself in the place of the jury, and in view of the evidence submitted pass upon the whole issue."

We do not believe the court's opinion in U. S. Smelting Co. v. Parry (C. C. A.) 166 F. 407, and our opinion in New York Life Ins. Co. v. Doerksen (C. C. A.) 64 F.(2d) 240, are to the contrary. In neither of those cases was the opinion of an expert asked on the ultimate issue to be decided by the jury. See Standard Fire Extinguisher Co. v. Heltman (C. C. A.) 194 F. 400; Bradford Glycerine Co. v. Kizer (C. C. A.) 113 F. 894; Castner Electrolytic Alkali Co. v. Davies (C. C. A.) 154 F. 938; Denver & R. G. R. Co. v. Vitello, 34 Colo. 50, 81 P. 766. The principle is clearly and concisely stated by Chief Justice Shaw in New England Glass Co. v. Lovell, 7 Cush. (Mass.) 319. After assuming that facts and circumstances in a case may be such as to permit elucidation by an expert, he said:

"In applying circumstantial evidence, which does not go directly to the fact in issue, but to facts from which the fact in issue is to be inferred, the jury have two duties to perform; first, by a rigid scrutiny of the evidence to ascertain the truth of the fact to which the evidence goes, and thence to infer the truth of the fact in issue."

Our apology for this discussion is, in part at least, due to the fact that counsel on each side in suits of this character that come to us seem to have drifted into the practice and habit of relying on such testimony,—the plaintiff on the statement of an expert that he is totally and permanently disabled, and the defendant on a contrary statement; so much so that it becomes a seeming contest between experts.

Our conclusion is that the competent evidence does not support a finding that appellee was totally and permanently disabled. For ten or more years after March, 1921, appellee was able to render valuable services, fairly continuously, as farmer, farm overseer and tending sheep. United States v. Peet (C. C. A.) 59 F.(2d) 728; United States v. Luckinbill (C. C. A.) 65 F.(2d) 1000. At times he did heavy labor, which he knew he ought not to do and which now and then caused him to take to his bed for a few days. He with full knowledge assumed that risk.

Reversed and remanded.

McDERMOTT, Circuit Judge (concurring).

I agree that upon the entire case, including the work record and his doctor's statement that his health permitted of some kinds of work, plaintiff was not entitled to go to the jury. But in arriving at that conclusion I have considered the testimony of the doctors.

Dr. Alley treated plaintiff since his discharge from the army. After describing and defining his ailment as an "acute articular rheumatism with complications of endocarditis and nephritis," he testified:

"With that type of illness attempting to do manual work is dangerous to the health and life of the individual suffering from it. There was a destruction of the heart muscle to the valves of the heart. This permanently weakens the heart, a full recovery never coming about. In my opinion that condition would remain with him during the remainder of his life and since that time his condition, as far as I have discerned, has become progressively worse. Under the definition of total and permanent disability which you have given me I would state that Steadman was totally and permanently disabled in May of 1919 and has been so permanently and totally disabled up to the present time, and it is my best judgment that this condition will remain throughout his life."

Dr. Quick treated him since 1922. After describing his condition, he testified:

"It necessitates restfulness and a man suffering from such a disability has a chance to live a longer length of time if he can rest than if he continues work. * * * Mr. Steadman, in my opinion, was totally disabled at that time and such total disability was one that was permanent and would continue throughout the remainder of his life."

The ultimate question to be decided by the jury was whether the plaintiff was totally and permanently disabled under his contract of insurance. To determine that, the jury must decide whether plaintiff, afflicted as he was with endocarditis and nephritis, was able to do such work as he was fitted to do, without injury to his health or danger to his life. Juries of laymen do not know the answer; they must have the opinion of doctors on the point or blindly return a verdict.[1] The majority opinion, I take it, is in accord, for it is stated therein that a doctor may testify to "what result would likely attend labor and efforts of various kinds, whether he should or should not attempt to carry on different occupations, and the effect upon him physically or mentally from so doing."

The objection, then, is not to the substance of the opinion evidence—that work would be injurious to the health of one so afflicted and that the condition is incurable—but to the form of the question or the answer. In order to get at the nub of the disagreement, I do not stop on the point that no objection was taken at the trial to the form of the question or answer; no opportunity was afforded to elicit the useful evidence in better form; no error is assigned thereon, nor is the matter mentioned in the briefs.

No objection to the form having been taken at the trial, the narrative statement does not apprise us of the exact words used.[2] It may be that Dr. Quick's opinion was to the bald question as to whether plaintiff was totally and permanently disabled. If so, I agree that such part of his testimony is incompetent, not because expert evidence may not invade the province of the jury, but because it may not invade the province of the court. What is "total and permanent disability" is a legal question, and is for the court to define. Dr. Quick qualified as a medical and not a legal expert, and testimony which embraces a legal conclusion as well as a medical opinion is incompetent. The Seventh Circuit excluded such testimony in United States v. Bass (C. C. A.) 64 F.(2d) 467. For this reason, I am in agreement with those cases cited in the majority opinion which hold that an expert may not be asked whether a deceased had testamentary capacity. I also agree with the Kansas Supreme Court that a witness cannot aver that where there is smoke, there must be fire. Upon that subject, the jury is quite as capable of forming an opinion as any witness.

The narrative statement of Dr. Alley's testimony discloses that his opinion was elicited as to plaintiff's total and permanent disability "under the definition you have given me," which undoubtedly refers to the conventional definition, the inability "to follow continuously any substantially gainful occupation." I think his answer is competent opinion evidence, although I think it would have been better practice, and more helpful to the jury, if the question and answer had been couched in the more colloquial language approved in the majority opinion.

Such testimony does, in a measure, invade the province of the jury, for in arriving at the ultimate question of "total permanent disability" which the underlying statute (38 USCA § 511) authorizes insurance against, the jury must follow the court's definition of such disability. And trial courts often adopt the definition of the director of the bureau above quoted. This definition of the bureau, while in somewhat formal language, undoubtedly represents the efforts of the director and his counsel to reduce the phrase "total and permanent disability" to common parlance; it is, nevertheless, only a definition designed to be of service in arriving at the ultimate fact of "total permanent disability." As said in the Lumbra Case, 290 U. S. 551, 559, 54 S. Ct. 272, 276, 78 L. Ed. 492:

"The above-quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed."

[1] The Second Circuit, speaking through Judge Learned Hand, has held that where an insured was afflicted with duodenal ulcer, recovery could not be had on a war risk policy without the testimony of a physician that his condition was permanent and totally disabling. United States v. Clapp (C. C. A.) 63 F.(2d) 793.

[2] No objection being made, counsel were not obliged to conform to Rule 11 which requires the full substance of evidence admitted over objection to be set out in the bill of exceptions; on the contrary, by Rule 10, they were required to state it in "condensed and narrative form."

I make no point that such an answer does not invade the province of the jury. I stand upon the proposition that an expert's opinion, otherwise admissible, is not incompetent because it is on an issue to be decided by the jury. It is true, as pointed out by the Supreme Court of the United States in Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U. S. 612, 4 S. Ct. 533, 536, 28 L. Ed. 536, that in "some adjudged cases as well as in some elementary treatises on evidence" such testimony is held to be inadmissible on that ground. Some state courts may still adhere to that rule, but in the absence of an applicable state statute, federal decisions govern in federal courts on general questions of the admissibility of evidence. De Soto Motor Corp. v. Stewart (C. C. A. 10) 62 F.(2d) 914. And the Supreme Court of the United States early considered the conflict on this point, and after an exhaustive examination of the authorities and reason for the rule, held that an expert's opinion was not to be ruled out because it invaded the province of the jury. Connecticut Mut. Life Ins. Co. v. Lathrop, supra. See, also, Charter Oak Life Insurance Co. v. Rodel, 95 U. S. 232, 24 L. Ed. 433, and Davis v. United States, 165 U. S. 373, 17 S. Ct. 360, 361, 41 L. Ed. 750, where a death sentence was affirmed in a case where "several lay witnesses were called, who testified as to their acquaintance with the defendant, and their opinion as to his sanity."

The same conclusion was reached by the Eighth Circuit Court of Appeals, speaking through Judge, now Justice, Van Devanter, in United States Smelting Co. v. Parry, 166 F. 407, 410. That opinion has been followed so many times that it is impracticable to even list the cases. An indication of the fact that it is the leading case on the subject of expert evidence may be had by noting that, in the Second Series of the Federal Reporter alone, it has been cited by our court in four cases,[3] and by the Eighth Circuit Court of Appeals in three.[4]

In that case the plaintiff claimed that defendant had failed to furnish him with a reasonably safe place in which to work; specifically he claimed that planks protruding over the end of a scaffolding without being secured created a dangerous condition. A practical brickmason was permitted to testify that the construction was dangerous. Objection was made that such testimony invaded the province of the jury. Judge Van Devanter stated the general rule that it was the province of the jury to determine the ultimate facts, and that witnesses could not usurp that function, and then said:

"But such a statement is not to be taken literally. It but reflects the general rule, which is subject to important qualifications, and never was intended to close any reasonable avenue to the truth in the investigation of questions of fact. * * * The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion when it will tend to aid the jury in reaching a correct conclusion; that true test being, not the total dependence of the jury upon such testimony, but their inability to judge for themselves as well as is the witness."

The same rule was clearly stated by Judge Phillips in New York Life Ins. Co. v. Doerksen (C. C. A. 10) 64 F.(2d) 240, 241:

"Where the matter under inquiry is one on which certain persons by reason of training, observation, or experience possess expert knowledge which will be of aid to the jury in reaching a correct solution of the issues and is therefore properly the subject of expert testimony, it is no objection that the opinion elicited from the expert is on an issue or point to be decided by the jury."

Dean Wigmore, in his work on Evidence, devotes an entire chapter to opinion evidence and two sections to the refutation of the statement found in some earlier cases that opinion evidence may not usurp the function of the jury, or be directed to the precise issue before the jury, and reaches the same conclusion as that reached by Justice Van Devanter and Judge Phillips. Wigmore on Evidence (2d Ed.) §§ 1920, 1921.

If the testimony is not inadmissible because it invades the province of the jury, is it inadmissible because it calls for a legal conclusion? The words used are not peculiarly legal phrases; "follow," "continuously,"

---

[3] U. S. Radiator Corp. v. Henderson (C. C. A. 10) 68 F.(2d) 733, certiorari denied, 292 U. S. 650, 54 S. Ct. 860, 78 L. Ed. 1500; New York Life Ins. Co. v. Doerksen (C. C. A. 10) 64 F.(2d) 240; United States v. Gower (C. C. A. 10) 50 F.(2d) 370; Runkle v. United States (C. C. A. 10) 42 F.(2d) 804.

[4] Illinois Power & Light Corp. v. Hurley (C. C. A. 8) 49 F.(2d) 681; Cropper v. Titanium Pigment Co. (C. C. A. 8) 47 F.(2d) 1038, 78 A. L. R. 737; Hartford Fire Ins. Co. v. Empire Coal Min. Co. (C. C. A. 8) 30 F.(2d) 794.

"substantially," "gainful" and "occupation" are a bit stilted and formal, perhaps, but are in common use and their meaning fairly well understood by the average man. They admit of definition, of course, as do most words; and courts have defined them repeatedly. But if an even simpler form of words were used to convey the same idea,—"Is plaintiff able to hold a steady job?"—courts would still have proper occasion to define "steady" and "job." If, as suggested by the majority, the testimony was that plaintiff should not attempt to carry on an occupation, courts must still explain to juries that "carry on" means with substantial regularity, and "occupation" means more than peddling apples on the street corner. No matter how simple the language used in the testimony, definition may be needed, and there will always be a chance that a witness will use language in one sense and the court in another. But that chance must be taken, or opinion evidence, and much other evidence, excluded.

What is or is not a legal conclusion, like what is a question of law and what a question of fact, may become troublesome. Many cases present a mixture. It then becomes a question of degree. "Total and permanent disability" is such a concentrated phrase, and admits of such wide variations in meaning, that I agree it must be reduced to simpler terms before a witness may use the expression in his testimony. "To carry on an occupation," while admitting of definition, is simple enough that the majority agree, I take it, that a doctor may express his opinion in that form. So of the expression "Could plaintiff hold a steady job without injury to his health?" To my mind the expression "follow a substantially gainful occupation" is not so abstruse, nor does it admit of such wide variety of meaning, as to class it with such expressions as "testamentary capacity" or "total disability." My mind is not acute enough to draw a distinction of substance between that phrase and "carry on an occupation" or "hold a job." All of them may be defined; but all of them carry a meaning to the average mind without further definition.

The same conception may be differently expressed: An expert may embrace in his opinion a conclusion of fact but not a conclusion of law. The precise boundaries of "a conclusion of law" are too elusive for my powers of delineation. I am satisfied testimony does not necessarily involve a legal conclusion because a witness uses a word or phrase which the court may later use and define in his charge. I do not believe that the opinion of a doctor that an insured is not physically able to follow continuously a substantially gainful occupation crosses the boundary that protects the powers of the court from invasion.

The Seventh Circuit Court of Appeals, which held some time ago that experts may not testify that an insured is totally and permanently disabled, has since qualified that statement by adding "without qualifying them with a knowledge of the meaning of total and permanent disability in a suit upon a war risk insurance policy." United States v. Motory, 71 F.(2d) 798, 799. Our own court, in marshaling the evidence in war risk insurance cases, has repeatedly weighed in the balance opinions of doctors that plaintiffs were in such condition that they could not follow continuously a substantially gainful occupation without risk. In the four war risk cases heard at the same term as this case, such evidence was considered. United States v. Brown (C. C. A. 10) 72 F.(2d) 608; United States v. Flippence (C. C. A. 10) 72 F.(2d) 611; United States v. Worsley (C. C. A. 10) 72 F.(2d) 776; United States v. Higbee (C. C. A. 10) 72 F.(2d) 773. I do not cite the many earlier cases of this court where the same evidence was considered as competent, except to note that our court, with the same judges now sitting, held in 1930 that it was reversible error to exclude the opinion of a physician as to the ability of an insured under a war risk policy to carry on a substantially gainful occupation. Runkle v. United States (C. C. A.) 42 F.(2d) 804.

In addition to my belief that such an opinion by a qualified doctor is helpful and competent, as a matter of theory, there is a practical side to the question. Trial courts and trial lawyers have, with substantial uniformity, adopted the director's definition in the trial of these war risk cases. The reports abound with cases where judgments have been affirmed where experts on both sides have used that definition. There must be many cases on appeal where that practice was followed. There may be others where more colloquial language was used by the witness. Even if the distinction drawn may be metaphysically defensible, it seems to me to be too fine a one for practical purposes. I cannot believe an appellate court should sustain judgments where doctors testify that an attempt to carry on an occupation would injuriously affect the health of the insured, and set aside judgments where the doctors put it negatively, that he cannot carry on a substantially gainful occupation without impairing his health. The difference in words em-

ployed to convey the same idea seems to me to be too slender a thread upon which to hang the right of recovery under an insurance policy.

It does not follow that in all cases a doctor's opinion as to the ability of the insured to follow a substantially gainful occupation is admissible. Where an insured has lost a leg, or an arm, or an eye, the question of whether one so afflicted may be able to follow some occupation is not a medical question, and it is one which the jury is quite as competent to decide as the doctor; the doctor is, therefore, not an expert on that subject, and his opinion should be excluded for that reason. Miller v. United States (C. C. A. 5) 71 F.(2d) 361. In many diseases, however, such as tuberculosis, encephalitis, endocarditis, nephritis, and neurosis, jurors are not as skilled as doctors in passing upon the question as to whether work, or certain kinds of work, would aggravate the condition or impair the chances of the insured to recover. In that class of cases, a doctor's opinion as to the effect of work on the insured is of value and should be admitted. In the case of such diseases, jurors would be largely at sea if the doctor were confined to a description of the pathological ravages of the ailment. The help that jurors and judges get is the testimony that work does or does not aggravate the disease.

Because the evidence is competent and admissible, it does not follow that it must be accepted by the jury. In Dayton Power & Light Co. v. Pub. Util. Comm. of Ohio, 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267, Justice Cardozo, speaking of the evidence of experts, said:

"But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury (Head v. Hargrave, 105 U. S. 45, 49 [26 L. Ed. 1028]) or to a judge (The Conqueror, 166 U. S. 110, 131, 133 [17 S. Ct. 510, 41 L. Ed. 937]), or to a statutory board. Uncasville Mfg. Co. v. Commissioner [C. C. A.] 55 F.(2d) 893, 897; Tracy v. Commissioner [C. C. A.] 53 F.(2d) 575, 577; Anchor Co., Inc., v. Commissioner [C. C. A.] 42 F.(2d) 99, 100; Gloyd

v. Commissioner [C. C. A.] 63 F.(2d) 649, 650."

Judge Lewis, in United States v. Gower (C. C. A. 10) 50 F.(2d) 370, 371, sustained a verdict which was opposed to the evidence of the only doctor who testified on the subject, and said:

"Moreover, expert testimony is only an aid to the solution of the main issue. It cannot be arbitrarily ignored or indolently accepted, and after it has been considered by the jury, if they believe their own experience, observations and common knowledge, as applied to the facts in the case, will guide them to a solution and verdict, they have a right to follow their own convictions, thus reached, although in doing so their verdict may be contrary to the opinion evidence of experts on the subject."

This court, in United States v. Doublehead, 70 F.(2d) 91, 92, held that the trial court erred in submitting a case to the jury despite the fact that a doctor had testified that in his judgment the insured could not follow a substantially gainful occupation. In that case this court said:

"Liability upon an insurance contract cannot be created by a doctor's opinion. The contract does not provide for payment if a doctor testifies that the insured is totally and permanently disabled. Doctors' opinions are of value in diagnosing ailments and in predicting the course they will run. Their value depends largely on the extent of the examination and the findings. * * * Upon the basis of this trifling examination and the facts heretofore narrated, the doctor's opinion rests. This opinion is without substantial basis and is of no value."

In determining the question of whether a case should go to the jury, the rule in the federal courts is that a verdict for the defendant should be directed unless the plaintiff adduces competent and substantial evidence in support of his claim. A doctor's evidence may be competent, but so insubstantial as not to support a verdict, as in the last two cases cited. So in this case. The qualified answers of the doctors, in the light of the undisputed work record, are too flimsy a support for a judgment on this policy. I therefore concur in the result.